COLUMBUS FENDRICK v. THE STATE.

No. 1439. Decided April 13, 1898.

1. **Murder—Testing Qualification of Jurors on Voir Dire—Questions as to Race Prejudice.**

On the trial of a negro for the murder of a white man, where the defense was insulting conduct of deceased to the wife of defendant, and defendant's counsel asked the jurors, on their voir dire examination, the following question, viz.: "Under the same facts and circumstances, could you, and would you, render the same verdict in a case where a negro killed a white man for insulting his (the negro's) wife, as in a case where a white man killed a negro for insulting his (the white man's) wife?" and, on objection by the State, the court excluded the question; Held, the ruling was error, and the question was a legitimate and proper one to probe the conscience of the jurors to ascertain whether or not they had any prejudice against defendant, he being a negro who had killed a white man, and whether they would give him the same fair and impartial trial and accord him the same reasonable doubt under the evidence as would be accorded a white man under like circumstances.

2. **Same—Charge Upon Murder in the Second Degree.**

On a trial for murder, where the defense was insulting conduct of deceased to the wife of defendant, the court charged upon murder in the first degree and manslaughter, and defendant excepted to the charge for omission to instruct upon murder in the second degree; Held, it rarely happens that a case could present murder in the first degree and manslaughter, and not also involve murder in the second degree; and Held further, if, under the facts in this case, defendant, though laboring under excitement on account of the insult to his wife, was not incapable of cool reflection, but was cool enough, notwithstanding the passion engendered, to form the intent to kill upon malice, the killing would be murder in the second degree upon implied malice, and not manslaughter.

3. **Same—Manslaughter—Adequate Cause—Murder in the Second Degree.**

It is not every case where adequate cause exists to reduce a homicide to manslaughter, that, ex necessitate, the case is one of manslaughter; the grade of offense is still to be governed by the state of mind in which the intent to kill is formed; and where, upon the testimony, the jury might probably have found murder in the second degree, it is error to omit in the charge to submit that issue.

APPEAL from the District Court of Falls. Tried below before Hon. SAM R. SCOTT.

Appeal from a conviction for murder in the first degree; penalty, imprisonment for life in the penitentiary.

The indictment charged appellant with the murder of R. H. Boyd on the 25th of April, 1897, by shooting him with a rifle. ·

The case is sufficiently stated in the opinion.

No briefs on file for appellant.

*W. W. Walling* and *Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at imprisonment in the penitentiary for life; hence this appeal.

There are but two questions that require consideration: First, whether or not the court erred in refusing to permit the defendant to ask certain questions of the special veniremen; and second, whether or not the court erred in failing to give the jury a charge on murder in the second degree. A proper discussion of these questions demands a brief statement of the nature of the case.

Appellant was a negro, and had a negro wife. Deceased was a white man. They lived near each other, not more than 200 yards apart. Up to the time of the homicide, the record shows that they were on friendly terms. The homicide occurred on Sunday night. On the Saturday night previous, deceased and his wife spent the night at Sanderlain's, who lived some two or three miles from the deceased. Deceased left Sanderlain's about 9:30 o'clock on Sunday, leaving his wife, who returned home later, arriving there about 2 or 3 o'clock in the afternoon. When she arrived, her husband was not at home, but arrived about thirty minutes later, and remained there during the balance of the day up to the homicide, which occurred between 8 and 9 o'clock that night. The evidence shows that deceased was in his house, reading a book; that some one called him. He went to the door and the party asked him to come out, that he wanted to see him. Deceased went out a short distance from the house, and in a short time a gunshot was heard. Deceased's wife ran out, and found her husband on the ground, wounded. She further stated, "When I got out there, I said, 'What, in the world, has happened? Who did it? It was Columbus.' I did not think it was Columbus, though, as they had never had any trouble. He [her husband] said, 'It was that scoundrel Columbus.' I asked deceased why he did it, and Mr. Boyd [deceased] replied, 'He said I insulted his wife.'" We would state in this connection that Mrs. Boyd testified that she recognized the defendant's voice when he hallooed for her husband, and asked him to come out. It was also shown by the witness Dr. Whiteside that deceased made a statement to him in regard to the matter. "He said that defendant did it. I asked him if he and defendant had had any row, and he said, 'No;' that he (defendant) just called him out, and said, 'What is that you said to my wife?' and shot me. That is all there was of it." Defendant's wife testified that, on that Sunday morning, she was at home with her three children; about 10 o'clock deceased came to her house, and asked where Columbus was, and that she told him she did not know. Then, according to her own language, "he asked me if I ever frolicked with the men. I asked him what he meant by that, and he asked me if I could give him some; and I told him that I did not do that kind of business. He then went home." She further stated that defendant came home about 12 o'clock that day; that she was not certain as to the time; and, while he was eating dinner, she told him about what Mr. Boyd (deceased) had said to her; that her husband quit eating, and re-

marked he would see Mr. Boyd about it; he seemed to be mad, and did not like it; that he did not have very much to say; that she next saw him about sundown, and he then seemed to be in a bad humor. The testimony further shows that he made some effort that evening to get some cartridges to fit his gun, from a neighbor who had previously promised them to him. When he returned, late in the evening, Arthur O'Neal, a brother-in-law, came with him; and, directly after the shooting, O'Neal and the wife of the defendant were seen going rapidly in the direction of O'Neal's home, which was in the neighborhood. After the homicide, defendant went to the house of one Dean De Grate, and told him that he had killed Boyd, the deceased, but did not tell him why or any of the circumstances. He desired to borrow a horse from De Grate, in order, as he said, to go to Chilton, and thence to Marlin, and surrender to the sheriff; but the party refused to lend him the horse. Defendant was arrested by one Williamson. He evidently surrendered to him, though this witness does not say so in terms. He states that defendant told him "that he wanted him to see him safe to Mr. Owens or Sheriff Emerson; he wanted to get the protection of the officers." After he was arrested, he made substantially the same statement to the officers, in regard to the cause of killing deceased, as heretofore stated. We give his own language, as testified by the witness Williamson, to wit: "After Owens had warned him, defendant stated that he had killed Mr. Boyd. He said that he went up to Sanderlain's that day, and when he got home that evening, Hattie (I think that was the name he called her), his wife, told him that Boyd had insulted her. He said he was eating supper at the time, and he just dropped his knife and fork, and he could not stand it; and he just got up, and got his gun, and went over to Boyd's to speak to Boyd, and that he spoke to Mr. Boyd, and Mr. Boyd reached his hand back this way (indicating the direction of his hip pocket), and said, 'God damn you,' and he shot him." This is substantially all the testimony that has any material bearing on the case.

The bill of exceptions with reference to the questions propounded to the jurors was as follows: "On the trial of the case, when several members of the special venire were being examined on their voir dire, counsel for defendant asked several veniremen 'whether or not, under the same facts and circumstances, he could and would render the same verdict in a case where a negro had killed a white man as in a case where a white man had killed a negro, the evidence being the same;' and, when said veniremen answered in the affirmative, defendant's counsel asked the question as follows: 'Under the same facts and circumstances, could and would you render the same verdict in a case where a negro killed a white man for insulting his (the negro's) wife as in a case where a white man killed a negro for insulting his (the white man's) wife?' which was objected to by the counsel for the State, and said objection was by the court sustained, to which action the appellant excepted." If the court had refused to permit the first question, appellant's contention would come directly under the rule laid down in Lester v. State, 2 Texas Criminal Ap-

peals, 432. However, an answer to the question whether or not they would, under the same facts and circumstances, render the same verdict in the case where a negro had killed a white man as where a white man had killed a negro was permitted by the court. But, when appellant desired to further probe the consciences of the jurors by asking them a question presenting the matter of prejudice upon the very issue involved in the case, the court refused to permit the question to be answered. The right to ask a question of this character at all is based on the idea of a certain race prejudice which, from common experience, is recognized to exist to a greater or less extent on the part of Southern people of the Anglo-Saxon race against the negro; and it follows, if an interrogatory of this character is permissible, the question should go to the full extent, and not merely halfway. The defense set up here was manslaughter, based on the idea that deceased had insulted the wife of appellant, and that this had been communicated to him, and he killed him thereafter on the first meeting, his passion being at that time excited on said account. This is a legitimate defense based on our statute; and the inquiry here proposed to be made by appellant of those who had been summoned to try him was, would they give him the same fair and impartial trial, and accord him the same reasonable doubt under the evidence, as if appellant was a white man, and had killed a negro for insulting his wife. The tendency of this question was simply to probe the consciences of the respective jurors to ascertain whether or not they had any prejudice against appellant, he being a negro, and having killed a white man, under the peculiar circumstances of the case; and, in our opinion, the court should have permitted the jurors to answer the question. If the answer had not shown a prejudice on the part of said jurors, or any of them, still it may have furnished appellant some basis upon which he might have exercised his right more intelligently to avail himself of his peremptory challenges.

The court gave a charge of murder in the first degree, manslaughter, and self-defense. Appellant excepted to the failure of the court to give a charge on murder in the second degree. Under the circumstances of this case, was such failure on the part of the court error? Unquestionably, according to the testimony, appellant had a right to have the jury instructed on manslaughter, as the evidence unequivocally presented that issue. The evidence also presents the issue of murder in the first degree; but according to our view there is also testimony tending to show that the homicide may have been murder in the second degree. It would rarely happen in any case that, where a court was required to give a charge on murder in the first degree and on manslaughter, there would be no phase of the case demanding a charge on murder in the second degree. Murder in the first degree, as we understand it, is where one, with a calm and deliberate mind and formed design, unlawfully doth kill another. It has been found exceedingly difficult, if not impracticable, to give a crystallized affirmative definition of murder in the second degree or upon implied

malice. It is generally defined as a negative quantity; that is, when the killing is shown to be unlawful, and it is not murder in the first degree upon express malice, and is not reduced to manslaughter or otherwise mitigated, then it is murder in the second degree. In both murder in the first and second degrees, malice is an essential ingredient; the difference being that in one case the malice is formed with a calm and deliberate mind, while in the other it is formed in a mind somewhat perturbed by passion. In manslaughter there is no malice. The killing is done upon passion which renders the mind incapable of cool reflection, aroused by adequate cause. In murder in the second degree there is passion; but the mind is still capable of reflection, and still capable of forming the intent to kill upon malice. Evidently, the mind is required to be less disturbed in murder of the second degree than if the killing was upon sudden provocation, where the intent to kill is formed upon adequate cause in a mind excited and incapable of cool reflection. Of course, it is conceded that, if adequate cause exists, a killing which might otherwise be considered murder in the second degree would be manslaughter. But it does not follow that, although the adequate cause exists to provoke the passion, an unlawful killing might not be murder in the second degree.

Applying the above principles to the case in hand: Suppose that the jury believed that the killing was done upon malice, but they did not believe beyond a reasonable doubt that when the intent to kill was formed, or when the homicide was committed, appellant was possessed of a calm and deliberate mind, would it be murder in the first degree? Evidently not, because, when the act was committed, one of the essential elements of murder in the first degree was lacking; that is, a cool and deliberate mind. Yet, being a killing upon malice, it would be murder in the second degree. Suppose, again, that the jury believed that deceased had insulted the wife of the appellant by making indecent proposals to her, and that this matter had been communicated to appellant, and his passion was excited, and he killed deceased on the first meeting thereafter; and suppose the jury believed that, although his mind was still laboring under excitement on account of the insult to his wife, yet that he was not rendered incapable of cool reflection, but that he was cool enough, notwithstanding the passion engendered, to form the intent to kill upon malice,—would this be manslaughter? We think not. On the contrary, it appears to our minds to be a case of murder in the second degree, upon implied malice. In other words, it is not every case in which adequate cause exists to reduce an unlawful homicide to manslaughter that ex necessitate reduces it to that grade of offense; the grade of offense being governed by the state of mind in which the intent to kill is formed. We believe that the evidence presented murder in the second degree, and that it was error on the part of the court not to give a charge on that subject. The jury had no alternative, under the charge, except to find appellant guilty of murder in the first degree or manslaughter. They gave him the least punishment for murder in the first degree. If they had been permitted by the court to

exercise their judgment, they might have found him guilty of murder in the second degree. For the errors of the court heretofore discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*