ROSALES-LOPEZ *v.* UNITED STATES

No. 79–6624. Argued January 12, 1981—Decided April 21, 1981

WHITE, J., announced the judgment of the Court and delivered an opinion, in which STEWART, BLACKMUN, and POWELL, JJ., joined. REHN-QUIST, J., filed an opinion concurring in the result, in which BURGER, C. J., joined, *post*, p. 194. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 195.

*John J. Cleary*, by appointment of the Court, 449 U. S. 947, argued the cause and filed a brief for petitioner.

*George W. Jones* argued the cause *pro hac vice* for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Heymann, Deputy Solicitor General Frey*, and *John De Pue*.

JUSTICE WHITE announced the judgment of the Court and delivered an opinion, in which JUSTICE STEWART, JUSTICE BLACKMUN, and JUSTICE POWELL joined.

The question here is whether it was reversible error for a federal trial court in a criminal case to reject the defendant's request that the court's *voir dire* of prospective jurors inquire further into the possibility of racial or ethnic prejudice against the defendant.

184

## I

Petitioner is of Mexican descent. In February 1979, he was tried before a jury in the United States District Court for the Southern District of California for his alleged participation in a plan by which three Mexican aliens were illegally brought into the country.[1]

The Government's evidence at trial described the following events. On the night of December 10, 1978, three aliens were led across the Mexican-American border and taken to a car, previously left for them on the American side. They drove to Imperial Beach, Cal., a town about eight miles inside the border. Early in the morning of December 11, they reached the home of Virginia Hendricks Bowling, where they were admitted into the garage of the house by petitioner. Bowling was an American citizen, apparently Caucasian, living in Imperial Beach with her 19-year-old daughter. Petitioner had been living with Bowling's daughter in her mother's house since July 1978.

Later in the morning, petitioner hid the three aliens and their guide in the trunk of a green Oldsmobile. Bowling drove the Oldsmobile north, through the San Clemente checkpoint, while petitioner followed in a grey Ford. After passing through the checkpoint, Bowling and petitioner exchanged cars. Petitioner proceeded to Los Angeles in the Oldsmobile and Bowling returned to Imperial Beach in the Ford. In Los Angeles, petitioner went to an apartment, which agents of the Immigration and Naturalization Service had had under surveillance for several weeks because they suspected that it was a drop site for illegal aliens. Upon

---

[1] Petitioner was charged with one count of conspiracy to conceal, harbor and shield, and illegally transport aliens, in violation of 18 U. S. C. § 371 and 8 U. S. C. § 1324; three counts of aiding and abetting the illegal transportation of aliens, in violation of 8 U. S. C. § 1324 (a) (2) and 18 U. S. C. § 2, and three counts of concealing, harboring, and shielding aliens, in violation of 8 U. S. C. § 1324 (a) (3).

arrival, the aliens were let out of the trunk and told to go into the apartment by petitioner. Shortly thereafter, petitioner was arrested when he left the apartment with one of the aliens.

At trial, the INS agents, Bowling, the three illegal aliens, and David Falcon-Zavala, another named principal in the smuggling arrangement who was arrested with petitioner, testified for the Government. Petitioner did not testify; his defense was principally to challenge the credibility of the Government witnesses. The jury convicted him of all the charges and the Court of Appeals for the Ninth Circuit affirmed. 617 F. 2d 1349 (1980).

Prior to trial, petitioner's counsel formally requested that he be allowed personally to *voir dire* the prospective members of the jury. At the same time, he filed a list of 26 questions that he requested the trial judge to ask, if the court denied his first motion. Among the questions submitted was one directed toward possible prejudice toward Mexicans:

> "Would you consider the race or Mexican descent of Humberto Rosales-Lopez in your evaluation of this case? How would it affect you?"

As permitted by Rule 24 of the Federal Rules of Criminal Procedure and pursuant to the practice in the Southern District of California, the trial judge conducted the *voir dire* himself. He asked about half of the questions submitted by petitioner.[2] Although he did not ask any question directed specifically to possible racial or ethnic prejudice, he did ask a question directed to attitudes toward the substantive charges

---

[2] The trial court asked the panel as a group questions concerning the following: knowledge of the participants in the trial; outside knowledge of the case; physical impairments that would interfere with their responsibilities as jurors; legal training; possible disagreement with the principle that a criminal defendant is presumed to be innocent. Each juror was asked to state some basic facts about himself or herself, including name, occupation, and spouse's occupation.

involved: "Do any of you have any feelings about the alien problem at all?" He subsequently rephrased this: "Do any of you have any particular feelings one way or the other about aliens or could you sit as a fair and impartial juror if you are called upon to do so?" App. 17–18.[3] The judge began the *voir dire* with the following general statement to the panel:

> "In order that this defendant shall have a fair and impartial jury to try the charges against him, it is necessary that we address certain questions to the panel to make sure that there are no underlying prejudices, there are no underlying reasons why you can't sit as a fair and impartial juror if chosen to do so in this case." *Id.*, at 14.

He ended his general questioning with the following:

> "Does any reason occur to anyone of you why you could not sit in this case as a fair and impartial juror, any reason whatsoever?" *Id.*, at 21.

Following the *voir dire,* defense counsel restated his request with respect to six of the submitted questions, including the one directed toward racial or ethnic prejudice.[4] He argued at sidebar that under *Aldridge* v. *United States,* 283 U. S. 308 (1931), a federal court "must explore all racial antagonism against my client because he happens to be of Mexican descent." App. 25. The judge declined to ask any further

---

[3] Two jurors were excused because of their responses to this question.

[4] The other five questions were:

1. "Have you ever employed or have friends that have employed illegal aliens?"

2. "Have you ever worked for the federal Government? If so, as what? How long?"

3. "Have you ever been the victim of a crime?"

4. "Have you ever sat as a juror in a civil or criminal case? What was the nature of the case and the verdict?"

5. "Are you able to speak Spanish? If so, how well? Would you be willing to accept the interpreter's translation?"

questions of the jury panel. Peremptory challenges were then exercised and the jury was sworn.

Petitioner appealed, unsuccessfully challenging the refusal of the trial judge to question the jurors about possible racial or ethnic bias.[5] The Court of Appeals for the Ninth Circuit noted that there is

> "[a] longstanding rule of criminal justice in the federal courts . . . that questions regarding possible racial prejudice should be put to the venire in prosecutions of minority defendants, at least where 'special circumstances' indicate that the defendant's race may be a factor in the trial." 617 F. 2d, at 1354.

The court noted that "[t]he extent of the federal rule is unclear." *Ibid.* It concluded, however, that this case did not contain such "special circumstances."

The Courts of Appeals have adopted conflicting rules as to when the failure to ask such questions will constitute reversible error. Some Circuits have adopted a *per se* rule, requiring reversal whenever the trial judge fails to ask a question on racial or ethnic prejudice requested by a defendant who is a member of a minority group. See *United States* v. *Bowles*, 574 F. 2d 970 (CA8 1978); *United States* v. *Robinson*, 485 F. 2d 1157 (CA3 1973); *United States* v. *Carter*, 440 F. 2d 1132 (CA6 1971); *United States* v. *Gore*, 435 F. 2d 1110 (CA4 1970); *Frasier* v. *United States*, 267 F. 2d 62 (CA1 1959). Other Circuits, including the Ninth, have rejected such a *per se* rule, holding that a trial judge is required to pose such a question only where there is some indication

---

[5] On appeal, petitioner also challenged the failure of the trial court to provide him a free copy of the transcript of a suppression hearing, the sentencing procedure applied to him, the denial of an evidentiary hearing on possible prosecutorial vindictiveness, the trial court's refusal to give an instruction on a lesser-included offense, the propriety of imposing consecutive sentences, and the constitutionality of 8 U. S. C. § 1324. The Court of Appeals rejected all of these contentions.

that the particular case is likely to have racial overtones or involve racial prejudice. See *United States* v. *Polk,* 550 F. 2d 1265 (CA10 1977); *United States* v. *Perez-Martinez,* 525 F. 2d 365 (CA9 1975). In light of this diversity of views, we granted certiorari. 449 U. S. 819.

## II

*Voir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. See *Connors* v. *United States,* 158 U. S. 408, 413 (1895). Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges where provided by statute or rule, as it is in the federal courts.[6]

Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. See *Ristaino* v. *Ross,* 424 U. S. 589, 595 (1976), quoting *Rideau* v. *Louisiana,* 373 U. S. 723, 733 (1963) (Clark, J., dissenting). In neither instance can an appellate court easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses.

---

[6] In *Swain* v. *Alabama,* 380 U. S. 202 (1965), we noted the connection between *voir dire* and the exercise of peremptory challenges: "The *voir dire* in American trials tends to be extensive and probing, operating as a predicate for the exercise of peremptories . . . ." *Id.,* at 218–219. We also noted there that although there is no federal constitutional requirement that peremptory challenges be permitted, the challenge is widely used in federal and state courts pursuant to statute or rule and is deemed to be an important aspect of trial by jury. *Id.,* at 219.

Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire*. In *Aldridge* v. *United States,* 283 U. S. 308 (1931), the Court recognized the broad role of the trial court: "[T]he questions to the prospective jurors were put by the court, and the court had a broad discretion as to the questions to be asked." *Id.,* at 310. See also *Ham* v. *South Carolina,* 409 U. S. 524, 528 (1973) (recognizing "the traditionally broad discretion accorded to the trial judge in conducting *voir dire* . . ."). Furthermore, Rule 24 (a), Federal Rules of Criminal Procedure, provides that the trial court may decide to conduct the *voir dire* itself or may allow the parties to conduct it. If the court conducts it, the parties may "supplement the examination by such further inquiry as [the court] deems proper"; alternatively, the court may limit participation to the submission of additional questions, which the court must ask only "as it deems proper."

There are, however, constitutional requirements with respect to questioning prospective jurors about racial or ethnic bias. The "special circumstances" under which the Constitution requires a question on racial prejudice were described in *Ristaino* v. *Ross, supra,* by contrasting the facts of that case with those in *Ham* v. *South Carolina, supra,* in which we held it reversible error for a state court to fail to ask such a question.

*Ham* involved a black defendant charged with a drug offense. His defense was that the law enforcement officers had "framed" him in retaliation for his active, and widely known, participation in civil rights activities. The critical factor present in *Ham,* but not present in *Ristaino,* was that racial issues were "inextricably bound up with the conduct of the trial," and the consequent need, under all the circumstances, specifically to inquire into possible racial prejudice in order to assure an impartial jury. *Ristaino, supra,* at 596,

597. Although *Ristaino* involved an alleged criminal confrontation between a black assailant and a white victim, that fact pattern alone did not create a need of "constitutional dimensions" to question the jury concerning racial prejudice. 424 U. S., at 596, 597. There is no constitutional presumption of juror bias for or against members of any particular racial or ethnic groups. As *Ristaino* demonstrates, there is no *per se* constitutional rule in such circumstances requiring inquiry as to racial prejudice. *Id.*, at 596, n. 8. Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion.

Absent such circumstances, the Constitution leaves it to the trial court, and the judicial system within which that court operates, to determine the need for such questions. In the federal court system, we have indicated that under our supervisory authority over the federal courts, we would require that questions directed to the discovery of racial prejudice be asked in certain circumstances in which such an inquiry is not constitutionally mandated. *Ristaino, supra,* at 597, n. 9.

Determination of an appropriate nonconstitutional standard for the federal courts does not depend upon a comparison of the concrete costs and benefits that its application is likely to entail. These are likely to be slight: some delay in the trial versus the occasional discovery of an unqualified juror who would not otherwise be discovered. There is, however, a more significant conflict at issue here—one involving the appearance of justice in the federal courts. On the one hand, requiring an inquiry in every case is likely to create the impression "that justice in a court of law may turn upon the pigmentation of skin [or] the accident of birth." *Ristaino, supra,* at 596, n. 8. Trial judges are understandably hesitant to introduce such a suggestion into their courtrooms.

See *Aldridge, supra,* at 310; *Ristaino, supra,* at 591. Balanced against this, however, is the criminal defendant's perception that avoiding the inquiry does not eliminate the problem, and that his trial is not the place in which to elevate appearance over reality.

We first confronted this conflict in *Aldridge, supra,* and what we said there remains true today:

> "The argument is advanced on behalf of the Government that it would be detrimental to the administration of the law in the courts of the United States to allow questions to jurors as to racial or religious prejudices. We think that it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute." 283 U. S., at 314–315.

In our judgment, it is usually best to allow the defendant to resolve this conflict by making the determination of whether or not he would prefer to have the inquiry into racial or ethnic prejudice pursued.[7] Failure to honor his request, however, will be reversible error only where the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury.

In *Ristaino,* the Court indicated that under the circumstances of that case, a federal trial court would have been required to "propound appropriate questions designed to identify racial prejudice if requested by the defendant." 424 U. S., at 597, n. 9. In *Ristaino,* the Court also made clear that the result reached in *Aldridge,* was based on this Court's

---

[7] Of course, the judge need not defer to a defendant's request where there is no rational possibility of racial prejudice. But since the courts are seeking to assure the appearance and reality of a fair trial, if the defendant claims a meaningful ethnic difference between himself and the victim, his *voir dire* request should ordinarily be satisfied.

supervisory power over the federal courts. 424 U. S., at 598, n. 10. In *Aldridge,* which *Ristaino* embraced, the Court held that it was reversible error for a federal trial court to fail to inquire into racial prejudice in a case involving a black defendant accused of murdering a white policeman. The circumstances of both cases indicated that there was a "reasonable possibility" that racial prejudice would influence the jury.

*Aldridge* and *Ristaino* together, fairly imply that federal trial courts must make such an inquiry when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups. This supervisory rule is based upon and consistent with the "reasonable possibility standard" articulated above. It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise such a possibility. There may be other circumstances that suggest the need for such an inquiry, but the decision as to whether the total circumstances suggest a reasonable possibility that racial or ethnic prejudice will affect the jury remains primarily with the trial court, subject to case-by-case review by the appellate courts.

## III

Evaluated against these standards, there was no reversible error in the *voir dire* afforded petitioner. At no point has petitioner argued that the matters at issue in his trial involved allegations of racial or ethnic prejudice: neither the Government's case nor his defense involved any such allegations. There were, then, no "special circumstances" of constitutional dimension in this case. Neither did the circumstances of the case reveal a violent criminal act with a victim of a different racial or ethnic group. In fact, petitioner was accused of a victimless crime: aiding members of his own ethnic group to gain illegal entry into the United States. Petitioner, therefore, falls within that category of cases in which the trial court must determine if the external circum-

stances of the case indicate a reasonable possibility that racial or ethnic prejudice will influence the jury's evaluation of the evidence. For two reasons, we do not believe that such a reasonable possibility has been demonstrated in this case.

First, the trial court reasonably determined that a juror's prejudice toward aliens might affect his or her ability to serve impartially in this case. The court, therefore, questioned the prospective jurors as to their attitudes toward aliens. There can be no doubt that the jurors would have understood a question about aliens to at least include Mexican aliens. The trial court excused two jurors for cause, based on their responses to this question. Removing these jurors eliminated, we believe, any reasonable possibility that the remaining jurors would be influenced by an undisclosed racial prejudice toward Mexicans that would have been disclosed by further questioning.[8]

Second, petitioner contends that "any latent racial antagonism" of the jurors toward Mexicans was likely to be exacerbated by Bowling's testimony concerning the relationship between petitioner and her daughter. Petitioner, however, failed to make this argument to the trial court in support of his requested question. Even if he had, however, it would not create a reasonable possibility that the jury's determination would be influenced by racial prejudice. Bowling's testimony as to petitioner's role in the particular smuggling operation involved in this trial was substantially corroborated by the other witnesses presented by the Government, including Falcon-Zavala and the three illegal aliens. Under the circumstances of this case, the racial or ethnic differences be-

---

[8] We also note that the trial court asked generally whether there were any grounds which might occur to the jurors as to why they could not sit as "fair and impartial" jurors. Coupled with the question concerning aliens, there is little reason to believe that a juror who did not answer this general question would have answered affirmatively a question directed narrowly at racial prejudice.

tween the defendant and a key Government witnesss did not create a situation meeting the standard set out above. The judge was not, therefore, required to inquire further than he did.

Under these circumstances, we cannot hold that there was a reasonable possibility that racial or ethnic prejudice would affect the jury. Therefore, the trial court did not abuse its discretion in denying petitioner's request, and the judgment of the Court of Appeals is affirmed.

*So ordered.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, concurring in the result.

I agree with the result reached by the plurality today and with most of its reasoning. I cannot, however, embrace the language contained in the last paragraph of Part II of the opinion which may be perceived as creating a *per se* rule requiring reversal of any criminal conviction involving a "violent crime" between members of different racial or ethnic groups if the district court refused to *voir dire* on the issue of racial prejudice. I do not disagree *in toto* with that paragraph, but fear that its use of the term "violent crime" and the term "different racial or ethnic groups" is apt to spawn new litigation over the meaning of these terms and whether the trial court properly assessed the possibility of racial or ethnic prejudice infecting the selection of the jury. It is undoubtedly true that such prejudice may occur in the case of a defendant accused of a violent crime where the defendant and victim are members of different racial or ethnic groups, and it is also undoubtedly true that there are circumstances other than these which may suggest to the trial judge the need for an inquiry into the possibility of prejudice. But knowing the contentiousness of our profession, the suggestion that a precise definition of "violent crime" or "different racial or ethnic groups" will ever be arrived at

leaves me unwilling to lay down the flat rule which seems to be proposed in the last paragraph of Part II. I would think that in the case of "violent crimes" where the defendant and victims are members of "different racial or ethnic groups," the decision as to inquiry on *voir dire* as to racial or ethnic prejudice "remains primarily with the trial court, subject to case-by-case review by the appellate courts." See *ante,* at 192. In my view, it is inappropriate for us to decide that there is always a "reasonable possibility" of prejudice solely because the crime is "violent." I would also not rule out the possibility of a finding of harmless error, but that may well be embraced in footnote 7 to the plurality's opinion.

As can be seen, my differences with the plurality are not great, but we are beseeched on so many appeals to reverse a judgment for procedural reasons which cannot fairly have been said to play a part in the factfinding process that I would leave somewhat more to the trial court's discretion than does the plurality, the decision as to whether or not questions on such as racial or ethnic prejudice should be asked on *voir dire.* We cannot, in the nature of things, always lay down "bright line" rules, but we should try to avoid definitions that do not define or clarify and hence invite litigation. It seems to me quite conceivable that a thoroughly competent and fairminded district court judge could conclude that the asking of such questions, or the devotion of a substantial amount of time to the inquiry, could well exacerbate whatever prejudice might exist without substantially aiding in exposing it.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The question in this case is whether, in the conduct of the *voir dire* examination of prospective jurors in criminal prosecutions in the federal courts, the trial judge must, upon request, ask at least one question concerning possible prejudice

against the minority group to which the defendant belongs. Settled law provides a simple answer to this question.[1]

The plurality's new answer to that question contains two parts: it holds that "federal trial courts must make such an inquiry when requested by a defendant accused of a violent crime and where the defendant and the victim are members of different racial or ethnic groups." *Ante,* at 192. Because no such "special circumstances" are present in this case, the plurality affirms the judgment of the Court of Appeals. *Ante,* at 192–194. Heretofore, federal law has required that a racial or ethnic prejudice inquiry be made when requested by the defendant, regardless of the presence or absence of special circumstances indicating that there is a reasonable possibility that prejudice will influence the jury. In this case, because the general questions asked by the learned trial judge were inadequate, I respectfully dissent.

An impartial tribunal is an indispensable element of a fair criminal trial. See *In re Murchison,* 349 U. S. 133, 136; *Irvin* v. *Dowd,* 366 U. S. 717, 722.[2] Before any citizen may be permitted to sit in judgment on his peers, some inquiry into his potential bias is essential. Such bias can arise from two principal sources: a special reaction to the facts of the particular case, or a special prejudice against the individual defendant that is unrelated to the particular case. Much as we wish it were otherwise, we should acknowledge the fact that there are many potential jurors who harbor strong prejudices against all members of certain racial, religious, or

---

[1] "For more than four decades, it has been the rule in federal courts that a trial court *must* inquire as to possible racial bias of the veniremen when the defendant is a member of a racial minority. Aldridge v. United States, 283 U. S. 308 . . . (1931)." *United States* v. *Powers,* 482 F. 2d 941, 944 (CA8 1973) (emphasis in original), cert. denied, 415 U. S. 923.

[2] A criminal defendant's right to an impartial jury arises from both the Sixth Amendment and principles of due process. See *Ristaino* v. *Ross,* 424 U. S. 589, 595, n. 6.

ethnic groups for no reason other than hostility to the group as a whole.[3] Even when there are no "special circumstances" connected with an alleged criminal transaction indicating an unusual risk of racial or other group bias, a member of the Nazi Party should not be allowed to sit in judgment on a Jewish defendant.

In 1931, in *Aldridge* v. *United States,* 283 U. S. 308, this Court addressed the problem of protecting criminal defendants in the federal courts from the possibility of racial or ethnic bias among prospective jurors. That case was not argued or decided in a vacuum. Rather, it followed a long line of state-court decisions requiring that prospective jurors be questioned about such potential prejudices. *Aldridge* itself involved the special circumstances that the crime at issue was murder, and that the defendant was black and the victim was a white police officer, but neither the reasoning in Chief Justice Hughes' opinion for the Court, nor the reasoning in the state-court opinions from which he quoted at length, relied on such special circumstances. The character of the *Aldridge* holding is best explained by a quotation of both the text and the appended footnotes discussing the leading cases from Florida, Mississippi, North Carolina, Texas, and South Carolina:

"The propriety of such an inquiry has been generally recognized. In *Pinder* v. *State,* 27 Fla. 370; 8 So. 837,

---

[3] The fact that such prejudice may not be a pervasive influence in the particular community from which the jury is drawn or even in society at large does not make this concern any less serious. As Chief Justice Hughes explained in *Aldridge* v. *United States,* 283 U. S. 308, 314:

"But the question is not . . . as to the dominant sentiment of the community and the general absence of any disqualifying prejudice, but as to the bias of the particular jurors who are to try the accused. If in fact, sharing the general sentiment, they were found to be impartial, no harm would be done in permitting the question; but if any one of them was shown to entertain a prejudice which would preclude his rendering a fair verdict, a gross injustice would be perpetrated in allowing him to sit."

the counsel for the accused sought to have the jurors asked on their *voir dire:* 'Could you give the defendant, who is a negro, as fair and as impartial a trial as you could a white man, and give him the same advantage and protection as you would a white man upon the same evidence?' The Supreme Court of Florida held that the refusal of the court to allow the question was error and reversed the conviction.[1] In *Hill* v. *State,* 112 Miss. 260; 72 So. 1003, the Supreme Court of Mississippi held that it was fatal error to refuse to permit a negro on trial for murder to put to prospective jurors on their *voir dire* the following question: 'Have you got any prejudice against the negro, as a negro, that would induce you to return a verdict on less or slighter evidence than you would return a verdict of guilty against a white man under the same circumstances?' The Supreme Court of North Carolina reversed the conviction of a negro because of the refusal of the trial judge to permit a juror to be asked if 'he believed he could, as a juror, do equal and impartial justice between the State and a colored man.' *State* v. *McAfee,* 64 N. C. 339.[2] See, also, *Fendrick* v. *State,* 39 Tex. Cr. 147; 45 S. W. 589; *State* v. *Sanders,* 103 S. C. 216; 88 S. E. 10.

"[1] In the *Pinder* case, *supra,* the court said: 'Though the question is not in express terms provided for in the statute above cited' (McClellan's Digest, § 10, p. 446) 'yet it was a pertinent, and, as we think, proper question, to test fully the existence of bias or prejudice in the minds of the jurors. It sought to elicit a fact that was of the most vital import to the defendant; and a fact, too, that if existent, was locked up entirely within the breasts of the jurors to whom the question was propounded; a knowledge of the existence of which could only be acquired by interrogating the juror himself. The answer to it if in the affirmative could have worked no harm to the juror or to anyone else, but would have done credit to the humanity and intelligence of the juror, and would have satisfactorily exhibited to the court and to the defendant his entire competency,

so far as the element of bias or prejudice was involved. But, if the answer to it from the jurors had been in the negative, then, we have no hesitancy in saying that it would have shown them to be wholly unfit and incompetent to sit upon the trial of a man of the negro race, whose right to a trial by a fair and impartial jury is as fully guaranteed to him under our constitution and laws, as to the whitest man in Christendom. And such incompetency asserts itself with superadded force in such a case as this where the life or death of the defendant was the issue to tip the scale in the jury's hands for adjustment.'

"[2] In that case, the court said (at p. 340): 'It is essential to the purity of trial by jury, that every juror shall be free from bias. If his mind has been poisoned by prejudice of any kind, whether resulting from reason or passion, he is unfit to sit on a jury. Here, his Honor refused to allow a proper question to be put to the juror, in order to test his qualifications. Suppose the question had been allowed, and the juror had answered, that the state of his feelings toward the colored race was such that he could not show equal and impartial justice between the State and the prisoner, especially in charges of this character, it is at once seen that he would have been grossly unfit to sit in the jury box.' "

283 U. S., at 311–313, and nn. 1, 2.

To avoid the risk that the opinion might be construed as applicable only to prejudice against members of the black race, Chief Justice Hughes added the following paragraph:

"The right to examine jurors on the *voir dire* as to the existence of a disqualifying state of mind, has been upheld with respect to other races than the black race, and in relation to religious and other prejudices of a serious character. *Potter* v. *State*, 86 Tex. Cr. 380, 384; 216 S. W. 886; *People* v. *Reyes*, 5 Cal. 347, 349; *Watson* v. *Whitney*, 23 Cal. 375, 379; *People* v. *Car Soy*, 57 Cal. 102; *Horst* v. *Silverman*, 20 Wash. 233, 234; 55 Pac. 52. In *People* v. *Reyes, supra,* Mexicans were charged with assault with intent to commit murder, and conviction was reversed because of the refusal to allow questions to determine whether a prospective juror was a member of

the Know Nothing party, and whether he had taken any oath or obligation which resulted in prejudice, or whether independent of such an oath he entertained a prejudice, which would prevent him from giving the accused a fair trial.[3]

"[3] The court in that case said (at p. 349): 'As the juror best knows the condition of his own mind, no satisfactory conclusion can be arrived at,. without resort to himself. Applying this test then, how is it possible to ascertain whether he is prejudiced or not, unless questions similar to the foregoing are propounded to him? . . .

" 'Prejudice being a state of mind more frequently founded in passion than in reason, may exist with or without cause; and to ask a person whether he is prejudiced or not against a party, and (if the answer is affirmative), whether that prejudice is of such a character as would lead him to deny the party a fair trial, is not only the simplest method of ascertaining the state of his mind, but is, probably, the only sure method of fathoming his thoughts and feelings. If the person called had not taken an obligation which would prejudice him against foreigners in such a manner as to imperil their rights in a court of law, he could say so, and the question and answer would be harmless. If, upon the other hand, he had taken oaths, and was under obligations which influenced his mind and feelings in such a manner as to deny to a foreigner an impartial trial, he is grossly unfit to sit as a juror, and such facts should be known.' "

283 U. S., at 313–314, and n. 3.

Then, toward the end of the *Aldridge* opinion, Chief Justice Hughes again made it clear that the Court's holding was not limited to a risk of racial prejudice arising from the special circumstances of a particular case:

"The argument is advanced on behalf of the Government that it would be detrimental to the administration of the law in the courts of the United States to allow questions to jurors as to racial or religious prejudices. We think that it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that

inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute." *Id.,* at 314–315.

In light of Chief Justice Hughes' reasoning, it is not surprising that the overwhelming majority of Federal Circuit Judges who have confronted the question presented in this case have interpreted *Aldridge* as establishing a firm rule entitling a minority defendant to some inquiry of prospective jurors on *voir dire* about possible racial or ethnic prejudice unrelated to the specific facts of the case.[4] I so read *Aldridge* in 1973,[5] and I think the message of the case is equally clear in 1981.[6] The state-court decisions on which Chief Jus-

---

[4] See *Frasier* v. *United States,* 267 F. 2d 62, 66 (CA1 1959); *King* v. *United States,* 124 U. S. App. D. C. 138, 139, 362 F. 2d 968, 969 (1966); *United States* v. *Gore,* 435 F. 2d 1110, 1111–1113 (CA4 1970); *United States* v. *Carter,* 440 F. 2d 1132, 1134–1135 (CA6 1971); *United States* v. *Bamberger,* 456 F. 2d 1119, 1129 (CA3 1972), cert. denied *sub nom. Crapps* v. *United States,* 406 U. S. 969; *United States* v. *Robinson,* 466 F. 2d 780, 781–782 (CA7 1972); *United States* v. *Booker,* 480 F. 2d 1310, 1310–1311 (CA7 1973); *United States* v. *Powers,* 482 F. 2d 941, 944 (CA8 1973), cert. denied, 415 U. S. 923; *United States* v. *Robinson,* 485 F. 2d 1157, 1158–1160 (CA3 1973); *United States* v. *Johnson,* 527 F. 2d 1104, 1106–1107 (CA4 1975); *United States* v. *Bell,* 573 F. 2d 1040, 1042–1043 (CA8 1978); *United States* v. *Bowles,* 574 F. 2d 970, 971–973 (CA8 1978); *United States* v. *Williams,* 612 F. 2d 735, 736–737 (CA3 1979), cert. denied, 445 U. S. 934. Cf. *Kuzniak* v. *Taylor Supply Co.,* 471 F. 2d 702, 703 (CA6 1972); *United States* v. *Grant,* 494 F. 2d 120, 122–123, and n. 6 (CA2 1974), cert. denied, 419 U. S. 849; *United States* v. *Bear Runner,* 502 F. 2d 908, 911–913 (CA8 1974).

[5] See *United States* v. *Booker, supra.*

[6] Nothing in *Ristaino* v. *Ross,* 424 U. S. 589, is inconsistent with this interpretation of *Aldridge. Ristaino* defined the circumstances under which a state trial court is constitutionally required to inquire into racial prejudice on *voir dire.* The Court in *Ristaino* expressly noted that it would require, under its supervisory power, that federal trial courts inquire into racial prejudice in·cases in which such inquiry was not constitutionally required. 424 U. S., at 597, n. 9. The Court also noted that

tice Hughes relied in *Aldridge* did not rest upon the presence of special circumstances indicating an unusual likelihood that racial or other prejudice would infect the jury venire.[7] Therefore, although such special circumstances were present in *Aldridge,* that decision has a broader significance. I can "perceive no reason why *Aldridge* should be applied more restrictively than the precedent on which it rests." *United States* v. *Gore,* 435 F. 2d 1110, 1112, (CA4 1970). Accordingly, unlike the plurality, I would join the majority of Federal Circuit Judges and decline to limit *Aldridge* to cases involving crimes of interracial violence.

In this case, I agree with the plurality's view that the *voir dire* was adequate to determine whether any special circumstances might give rise to juror prejudice. The trial judge did inquire about prejudice related to the smuggling of aliens into California, and I agree that the possibility of prejudice resulting from the relationship between the defendant and the witness Bowling's daughter was a matter that the trial judge could best evaluate. However, the *voir dire* was inadequate as a matter of law because it wholly ignored the risk that potential jurors in the Southern District of California might be prejudiced against the defendant simply because he is a person of Mexican descent. Because the defendant's lawyer perceived a risk of such irrational prejudice in that

---

*Aldridge* was based on the supervisory power, not on the Federal Constitution. 424 U. S., at 598, n. 10. See *United States* v. *Williams, supra; United States* v. *Bowles, supra.*

[7] The Fourth Circuit, in *United States* v. *Gore, supra,* examined the state-court decisions cited in *Aldridge* and found that some involved crimes with no racial overtones whatsoever. See 435 F. 2d, at 1111–1112. Chief Justice Hughes' discussion of these decisions in *Aldridge* indicates that that case established "a broad rule that in any criminal case an accused has a right to inquire whether racial prejudice precludes any juror from reaching a fair and impartial verdict." 435 F. 2d, at 1111. See also *King* v. *United States, supra,* at 139, 362 F. 2d, at 969.

District, his request for a specific question concerning it should have been granted.[8]

I respectfully dissent.

---

[8] It is, of course, clear that the trial judge's duty to give such an instruction was not dependent on the phrasing of the particular questions submitted by defense counsel. See *Aldridge,* 283 U. S., at 311. It is equally clear that, although trial judges have broad discretion to formulate *voir dire* questions, the general question whether there was any reason "why you could not sit in this case as a fair and impartial juror," see *ante,* at 186, is not an adequate substitute for a specific inquiry; if it were, trial judges might be well advised simply to ask that question and nothing else. See, *e. g., United States* v. *Carter, supra,* at 1134–1135; *United States* v. *Robinson, supra,* at 782.