Jesse Harold MAULDIN, Johnny H. Mauldin, Chris Young, Lawrence Bullette & Larry Thomas, Appellants,

v.

The STATE of Texas, Appellee.

Nos. 12–90–00216–CR, 12–90–00217–CR, 12–90–218–CR and 12–90–00194–CR.

Court of Appeals of Texas, Tyler.

Dec. 31, 1993.

Gerald H. Goldstein, San Antonio, Clifton L. Holmes, Longview, Jeff L. Haas, Tyler, Karen Holcomb, Newton, for appellants.

Troy Johnson, Asst. Dist. Atty., Tyler, for appellee.

Before RAMEY, C.J., and BILL BASS and HOLCOMB, JJ.

HOLCOMB, Justice.

This is an appeal from a conviction, by a jury, of engaging in organized criminal activity. Appellants were charged with entering into a combination in an attempt to buy about fourteen (14) pounds of cocaine from California and bring it to Smith County, Tex-

as, for approximately $150,000. We will reverse and remand for a new trial.

Appellants join together in eighteen (18) points of error. By two points of error, they complain that the evidence was insufficient to convict them of the offense as charged. We shall consider these points first.

■ In reviewing the sufficiency of the evidence, the reviewing court must consider all the evidence which the jury was permitted to consider whether rightly or wrongly. *Thomas v. State*, 753 S.W.2d 688 (Tex.Cr. App.1988). The standard for reviewing sufficiency of the evidence questions on appeal is whether, after viewing the evidence in a light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234 (Tex.Cr.App.1989); *Stokes v. State*, 853 S.W.2d 227 (Tex.App.— Tyler 1993, no pet.). The reviewing court is not to act as a thirteenth juror, but rather, to position itself as "a final, due process safeguard ensuring only the rationality of the factfinder." *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988).

The jury was charged as to each defendant that if they found the named defendant had formed a combination with four or more of the other five defendants to deliver cocaine to Johnny Howard Mauldin by performing one of fifteen (15) enumerated acts, then they were to find the defendant guilty of engaging in organized criminal activity.

Appellants argue that: (1) there was no evidence of an agreement to deliver cocaine to Johnny Mauldin; (2) there was no evidence of a plan to deliver cocaine to Johnny Mauldin; and (3) no cocaine was found in the homes, the motel rooms, the autos, the personal effects, or on the persons of Appellants. Appellants also argue that evidence which should have been withheld from the jury was admitted and should not be considered. In determining the sufficiency of the evidence on appeal, all of the evidence that was before

the jury will be considered. *Thomas*, 753 S.W.2d 688.

The State's brief contained only the sentence: "The State denies each and every allegation contained in point[s] of error fourteen [and fifteen]."

■ The evidence shows that there were telephone conversations between Chris Young and Johnny Mauldin. The purchase of drugs from California was discussed during these conversations. They discussed that people would have to be paid to move the drugs, and talked about the coordination of the delivery of and payment for the drugs. The evidence shows that Lawrence Bullette and Rose Lee Banks [1] flew to Dallas and checked into a Marriott hotel in Dallas. Jessie Mauldin drove to the Dallas–Fort Worth Airport where he met Young, and together they checked into a La Quinta motel in Garland. The motel records show calls between the rooms in the Marriott, where Jessie Mauldin and Young were, and the La Quinta motel where Bullette and Banks were. Jessie Mauldin and Young went to the Marriott Hotel to the room rented by Bullette and Banks. They were joined by Johnny Mauldin and Larry Ray Thomas.[2] The Mauldins left the room with a bag that was taken to Thomas' truck. Thomas drove the truck back to Smith County where it was stopped. The bag contained approximately fourteen pounds of cocaine. Bullette was stopped after leaving the room with a suitcase containing $148,845.00. This is sufficient evidence that the Mauldins, Young, Bullette, Banks, and Thomas engaged in organized criminal activity, and the points of error are overruled.

By other points of error, Appellants complain that the evidence from the wiretap was improperly obtained and should have been suppressed.

In March, 1988, this investigation reached the point that the police asked the trial court to order the phone company to install a pen register to record telephone numbers dialed

---

1. The action against Rose Lee Banks was severed and is not part of this appeal.

2. Larry Ray Thomas was also convicted and appealed, but he was killed in an execution-style slaying which the police believe to have been drug related.

from the Mauldins' phone. This was done in accordance with TEXAS CODE OF CRIMINAL PROCEDURE article 18.21 (Vernon Supp.1988). Based on information gathered from the pen register, the police asked the court, in late March of 1988, to order the phone company to give them a digital display pager which would respond to the phone number of a pager that had been leased by a Jesse Mosley, but which the police believed to actually belong to the Mauldins. The information gathered by these devices enabled the police to prepare a request for a wiretap which was approved by the judge designated for the administrative judicial district. The information obtained through the wiretap was critical to the prosecution of Appellants.

■ Appellants argue that the trial court had no authority to grant the order authorizing the use of a digital display pager because it violated the ELECTRONIC COMMUNICATIONS PRIVACY ACT OF 1986.[3] They argue that the use of the display pager was in fact a wiretap, and even if the trial court could authorize the wiretap, he could not preside at the trial without violating TEXAS CODE OF CRIMINAL PROCEDURE article 18.20, section 9(h). Appellants also argue that the evidence was obtained in violation of federal and state statutes and was therefore inadmissible under TEXAS CODE OF CRIMINAL PROCEDURE article 38.23(a). During oral argument, Appellants contended that the recently decided case of *Richardson v. State*, 865 S.W.2d 944 (Tex.Cr.App.1993), was dispositive of the issue and none of the interceptions from the wiretap were admissible because it was the fruit of an intrusion stemming from the initial illegal use of a pen register.[4]

■ Appellants argue that federal wiretap regulations were binding upon the state when the display pager was ordered by the trial court. This 1986 statute clearly added digital display pagers to the devices that Congress considered to be covered by Title 18, UNITED STATES CODE sections 2510(12),

2511, 2516 and 2518 (West Supp.1993). *See* S.Rep.No. 99–541, 99th Cong., *reprinted in* 1986 U.S.C.C.A.N. 3555 at 3569. The statute mandated procedures for the states to follow before they could intercept "electronic communications" such as a digital display pager. 18 U.S.C.A. § 2516 (West Supp.1993). However, the statute was not to trench on state law until the first of two events occurred: the passage of conforming legislation, or two years from the effective date of the federal Act, *i.e.,* Oct. 21, 1988. ELECTRONIC COMMUNICATIONS PRIVACY ACT OF 1986, PUB.L. 99–508, § 111(b), 100 Stat. 1848, 1859 (1986). Thus, the federal statute in effect against state police action when the display pager was used in March, 1988, only prohibited the "aural acquisition," as opposed to the "aural or other acquisition" of wire or oral communications. 18 U.S.C.A. § 2510(4) (West 1970). The display was a visual acquisition of a wire communication, not an "aural," but an "or other" acquisition. Since the federal statute did not forbid the intercept of the display pager's messages, any intercept would have been valid and lawful. The wiretap order was based on information validly and lawfully obtained from the display pager. Since the wiretap was based on the valid and lawful intercept of the display pager, the results of the wiretap were not tainted and they were properly received into evidence. 18 U.S.C.A. § 2515.

■ We have already held that the Texas statute was not violated by the intercept of the visual display of the pager and that the information was not the type contemplated by TEXAS CODE OF CRIMINAL PROCEDURE, article 18.20, section 9(h). *Mauldin v. Coats*, 786 S.W.2d 737 (Tex.App.—Tyler 1989, orig. proceeding). There was no reason for the trial court to recuse himself under these facts. Appellants argue that notwithstanding the writ of mandamus they filed in this Court, the TEXAS GOVERNMENT CODE section 74.059(c)(3) required the motion to recuse to

---

3. Pub.L. 99–508, Title I, § 101(a), Oct. 21, 1986, 100 Stat. 1848, 1851, codified as 18 U.S.C.A. § 2510 *et seq.*

4. As of the date of this opinion *Richardson* was not final, since two motions for rehearing were pending. However, Appellants never asserted

any objection to the pen register or the display pager as an unwarranted search in violation of the UNITED STATES CONSTITUTION, Amendment IV, or TEXAS CONSTITUTION, article I, section 9. Therefore, we believe that even if *Richardson* was controlling, Appellants have waived error.

be heard by a court other than the trial court. Appellants rely on a title of the Government Code controlling the assignment of visiting or retired judges. In this case, the judge was sitting in the court to which he was elected and the code section is not applicable.

Appellants argue that *State ex rel Millsap v. Lozano*, 692 S.W.2d 470 (Tex.Cr.App.1985) controls any situation where a motion to recuse has been filed. We do not agree. *Millsap* dealt with a Bexar County Court at Law judge who tried to order the recusal of another Bexar County Court at Law judge after the first refused to recuse himself. The Court of Criminal Appeals held that what is now TEXAS GOVERNMENT CODE section 74.-059(c)(3), applied only to district judges. *Id.*, 692 S.W.2d at 481. That court noted that TEXAS RULE OF CIVIL PROCEDURE 18(a) was probably not applicable to criminal cases, but that in any event the motion had not been timely filed. *Id.*; *Autry v. Autry*, 646 S.W.2d 586 (Tex.App.—Tyler 1983, no writ). The court in *Millsap* relied on *McLeod v. Harris*, 582 S.W.2d 772 (Tex.1979) for the proposition that a district judge had to either recuse himself or forward the motion to the presiding judge of the administrative district for a hearing on the motion. *Millsap*, 692 S.W.2d at 477. *McLeod* was a case where an assigned judge in a civil case refused to recuse himself or send the motion to be heard by the presiding judge of the administrative district. *McLeod*, 582 S.W.2d at 773. Thus, *McLeod* was consistent with the statute which required an *assigned* district judge to either recuse himself or forward the motion. TEX. GOV'T CODE § 74.059. While the statute is applicable to criminal cases in the absence of legislative intent to the contrary, there is implicit in the location of section 74.059 in the chapter of the Government Code dealing with the assignment of judges the intent for the section to apply when there has been an assignment of a district judge to hear a case. *McClenan v. State*, 661 S.W.2d 108, 110 (Tex.Cr.App.1983).[5]

Appellants further complain the court erred by denying their right to intelligently use their peremptory challenges because the trial court arbitrarily curtailed *voir dire* by refusing to allow them to question veniremembers about racial prejudice.[6]

■ We recognize the right to be represented by counsel is guaranteed by the Sixth Amendment of the UNITED STATES CONSTITUTION, and Article I, Section 10 of the TEXAS CONSTITUTION encompasses the right of counsel to question the members of the jury panel in order to intelligently exercise peremptory challenges, subject to the trial court imposing, within its sound discretion, reasonable restrictions on *voir dire* examination. *Abron v. State*, 523 S.W.2d 405, 408 (Tex.Cr.App. 1975); *Smith v. State*, 513 S.W.2d 823 (Tex. Cr.App.1974). Appellants here argue that the trial was racially charged from its inception. They point to the three failed attempts in Smith County to find a jury, and the decision of the trial court to move the trial to Van Zandt County where only about four percent (4%) of the population is black. Appellants also point to the venirepersons who said that some members of the panel were being less than honest when they said they were not prejudiced because of a number of racially charged remarks which had been made by venirepersons.

Venireperson Baird testified that she overheard potential jurors "talking about Grand Saline and how the attitude of the white people has always been toward blacks and they were laughing about it and they were talking about calling—they were referring to the black people down there as 'niggers' and they were dragging them out of town and tarring and feathering and all that kind of stuff, and the lady in pink said something about ... they [blacks] just weren't very smart. And one of the ladies ... said she didn't think she was prejudiced by she wouldn't want one of her daughters to marry one of them." Another venireperson, Albert, stated that she overheard a potential juror comment "he wished they could load the jury

---

**5.** To the extent we cannot determine whether the trial judge was assigned, we decline to follow *Crawford v. State*, 807 S.W.2d 597 (Tex.App.— Dallas 1991, no writ).

**6.** All of the Appellants are black.

with Ku Klux Klan," and she also heard the defendants referred to as "nigger and things like that."

Appellants admit that a general question about racial prejudice had been asked of all members of the venire. The judge told the lawyers that he wanted to shorten *voir dire* and keep racial prejudice out of the trial. To this end, he refused to allow a detailed questioning about racial bias on the ground that it was repetitious. The judge stated, "I do not want racism brought [up, do] not even mention it from now on." Appellants argue that while the trial court tried to keep racism out by not mentioning it, racism's hidden, and thus more sinister, quality was not only allowed but was assured to exist on the jury.

On behalf of Appellant Jesse Mauldin and all the other Defendants, Jesse's counsel perfected this point for appeal by making an offer of proof as to the questions which counsel on behalf of all Defendants would have asked concerning racial prejudice. By the trial court's order, counsel was specifically prevented from asking the following questions:

(1) Would the fact that there is a monument to the Confederacy with a fresh Confederate Flag ... in front of this courthouse to which you and these black defendants have to pass affect your fair and impartial consideration of the evidence with regard to whether the State has proved beyond a reasonable doubt these black defendants guilt.

(2) Would the fact that there is a monument to the Confederacy with the fresh Confederate flag by which both you and the black defendant have to pass affect your fair and impartial consideration of the punishment.

(3) How do you feel about requiring both the Defendants and yourselves to pass by such a monument with a fresh Confederate flag placing in front of it.

(4) Would the fact that there was a sign in your county to the effect of, 'Nigger, don't let the sun set on you in this county,' affect your fair and impartial consideration of the evidence weight regard to whether the State has proved

beyond a reasonable doubt these black defendants' guilt.

(5) Would the fact of such a sign in your county affect your fair and impartial consideration of punishment.

(6) How do you feel about such a sign having been in this county with respect to these black defendants' trial.

(7) Would the fact that the Defendants, each of whom are black, affect your fair an impartial consideration of the full range of punishment.

(8) How many of you have blacks as neighbors.

(9) Whether any of the jurors are now or have had membership in the Ku Klux Klan, in the White Citizen's Counsel and any white supremacy groups.

(10) Whether or not any of the jury panel have had experience or confrontations or altercations with blacks which they found emotionally disturbing to them.

(11) How many of the prospective jurors went to school in integrated schools.

(12) How many of the prospective jurors' children go to integrated schools.

(13) Whether or not any of the prospective jurors belong to any segregated organizations or clubs.

(14) Whether any of the prospective jurors' children attend private schools.

(15) Which of the jurors made statements to the effect that, they would like to stack the jury with KKK members.

(16) Which of the prospective jurors made the statement that they would not want their daughter or child to marry a black.

(17) Which of the prospective jurors made the statement that blacks all look alike.

(18) Which of the prospective juror were present when the statement was made that these individuals (defendants) brought this case to the wrong county.

(19) Which of the prospective jurors congratulated Mrs. Albert, Juror No. 82, for making the statement about the jury being hypocritical with respect to their responses on racism.

(20) Which of the prospective jurors chastised or criticized Mrs. Albert, Juror No. 82, for making those statements.

(21) Which of the prospective jurors heard any other jurors and, if so, to name those prospective jurors who made racial slurs during or prior to jury selection.

(22) Whether or not if any of these jurors had a loved one, a family member or friend sitting in the position of the defendants would they want to be tried by them due to the color of their skin or race?

On behalf of Appellant Jesse Mauldin, his counsel then asked the court if the request to ask these questions was being denied. The court replied, "Denied. Yes, Sir."

The trial court allowed the questions to be entered into the record, but they had to do it in the presence and hearing of the venire panel.

Appellants contend that these questions were essential for the Appellants to effectively and intelligently exercise not only challenges for cause, but also their peremptory challenges. Appellants argue these questions were of the type which the Court of Criminal Appeals in *Abron* recognized as being essential to the effective representation of an accused when the Court quoted with approval an opinion from 1898, saying "The tendency of this question was simply to prove the conscience of the respective jurors to ascertain whether or not they had any prejudice against Appellant, he being a negro.... If the answer had not shown any prejudice on the part of said jurors, or any of them, still it may have furnished Appellant some basis upon which he might have exercised his right more intelligently to avail himself of his peremptory challenges." *Abron*, 523 S.W.2d at 409.

Both sides agree that the analysis of whether the questions should have been allowed is governed by *Abron* and cases cited therein. The State argues that the questions to the venire must have some bearing on a question to be determined by the jury. In a drug possession case there is no issue of race and the Defendant does not have a right to ask irrelevant questions. By the State's rea-

soning, the questioning of veniremen about any racial bias would be precluded except in cases where racial bias was an element of the offense or where the victim and the accused belonged to different races. Appellants argue that as in *Abron*, while there was no inherent issue of race to be determined, the ability of the veniremen to exclude race from their deliberations was critical to the appellants' intelligent use of peremptory challenges. Appellants seem to agree that *Abron* is limited to situations where there is some articulable basis for believing racial animus may be a factor in the deliberation of the jury.

In *Abron*, the black defendant had a right to question the venire about their ability to be fair even though the victim was white. *Abron*, 523 S.W.2d at 409, *citing Fendrick v. State*, 39 Tex.Cr. 147, 45 S.W. 589 (1898). In *Plair*, the black defendant was allowed to ask questions of racial bias in a theft case. *Plair v. State*, 279 S.W. 267 (1925) (race of the victims is not identified). The court in *Plair* reiterated that:

It is always commendable for a trial court to dispatch business with promptness and expedition, but this salutary result must never be obtained at the risk of denying to a party on trial a substantial right.

*Plair*, 279 S.W. at 269 (citation omitted). The court held that there was a clear distinction between individual *voir dire* and group questioning. *Id.* An appropriate question to prepare for the intelligent exercise of peremptory challenges does not have to meet the same standards of relevance as one that would be used to establish a challenge for cause. *Id.* The trial court has the discretion to control the examination of the venire, but that cannot be used to deny the defendant an intelligent means of exercising the privilege of arbitrarily excusing a member of the venire. *Id.* (opinion on denial of motion for rehearing).

In this case, the venire itself, as shown above, brought the question of racial bias into issue. The trial court had to balance his wide discretion to limit and control *voir dire* with the Appellants' right to intelli-

gently exercise peremptory challenges. *Abron,* 523 S.W.2d at 408.

Some of the questions which the Appellants proposed were within the discretion of the trial court to either allow or deny. Those questions that were repetitious or vexatious, those that were not in proper form, and those that inquired into personal habits rather than personal prejudices and moral beliefs were properly excluded. *McCarter v. State,* 837 S.W.2d 117, 120 (Tex.Cr.App.1992); *Smith v. State,* 513 S.W.2d 823 (Tex.Cr.App. 1974); *Hernandez v. State,* 508 S.W.2d 853 (Tex.Cr.App.1974); *Densmore v. State,* 519 S.W.2d 439 (Tex.Cr.App.1975). But questions such as those concerning whether members of the venire or their children want integrated schools, how many have blacks for neighbors, whether they had ever held membership in the Ku Klux Klan or White Citizens Council, whether they belonged to segregated organizations or clubs, whether they had heard the racial comments mentioned and their reactions to them would have given insight into their personal prejudices and beliefs and should have been allowed. Appellants' fourth point of error is *sustained* and since our ruling on this point is dispositive, we need not address the Appellants' remaining points.

The judgment of the trial court is **reversed and the case is remanded for a new trial.**