**Billy Wayne STOKES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 12–88–00163–CR.**

Court of Appeals of Texas,
Tyler.

April 29, 1993.

Charles M. Cobb, Mt. Pleasant, for appellant.

Frank Long, Dist. Atty., Sulphur Springs, for appellee.

RAMEY, Chief Justice.

Following a four-month jury trial, Appellant Billy Wayne Stokes was convicted on May 19, 1988, of the offense of possession of a controlled substance with intent to deliver and sentenced to 15 years' confinement. On appeal, Appellant raises four points of error. We **affirm** the conviction.

By his first point of error, Appellant alleges that the trial court erred in failing to grant his motion for directed verdict. We will construe this point as a challenge to the sufficiency of the evidence to support the conviction. *Madden v. State*, 799 S.W.2d 683 (Tex.Cr.App.1990). In reviewing the sufficiency of the evidence, the relevant question is whether after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 at 320, 99 S.Ct. 2781 at 2789, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154, 158–161 (Tex.Cr.App.1991). In a case where the conviction is based upon circumstantial evidence, the conviction cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except the guilt of the appellant; in other words, if the evidence supports a reasonable inference other than the appellant's guilt, a finding of guilt beyond a reasonable doubt is not rational. *Goff v. State*, 777 S.W.2d 418 (Tex.Cr.App.1989); *Humason v. State*, 728 S.W.2d 363, 366 (Tex.Cr. App.1987); *Alvarez v. State*, 813 S.W.2d 222 (Tex.App.—Houston [14th Dist.] 1991, pet ref'd).[1]

1. In *Geesa,* the Court of Criminal Appeals abandoned the "reasonable hypothesis" analytical construct traditionally employed by appellate courts in reviewing circumstantial evidence cases, and instead adopted a new definitional instruction on "reasonable doubt." *Id.,* at 161. However, the court applied limited prospective application to the new definition and the elimi-

In the instant case, Appellant was indicted and convicted for violation of § 4.03 of the CONTROLLED SUBSTANCES ACT, TEX.REV. CIV.STAT.ANN. art. 4476–15 § 4.03 (Vernon Supp.1987)[2], which provides:

(a) Except as authorized by this Act, a person commits an offense if he knowingly or intentionally manufactures, delivers, or possesses with intent to manufacture or deliver a controlled substance listed in Penalty Group 1.[3]

. . . . .

(c) A person commits an aggravated offense if the person commits an offense under Subsection (a) of this section and the amount of the controlled substance manufactured, delivered, or possessed with intent to manufacture or deliver is, by aggregate weight, including any adulterants or dilutants, 28 grams or more.
(d) An offense under Subsection (c) of this section is:

. . . . .

(3) punishable by confinement in the Texas Department of Corrections for life or for a term of not more than 99 years or less than 15 years, and a fine not to exceed $250,000 if the amount of the controlled substance manufactured, delivered, or possessed with intent to manufacture or deliver is, by aggregate weight, including any adulterants or dilutants, 400 grams or more.

Possession is defined as "actual care, custody, control or management" over the controlled substance. TEX.REV.CIV.STAT.ANN. art. 4476–15, § 1.02(36).

 In order to establish the offense, the State must prove that Appellant exercised care, control or management over the contraband and that he knew the matter possessed was contraband. *Humason*, 728 S.W.2d at 364; *Denbow v. State*, 837 S.W.2d 235, 236 (Tex.App.—Dallas 1992, pet. refused). Both of these elements may be proven circumstantially; however, the evidence must establish affirmative links, beyond mere presence, between the accused and the controlled substance. *Humason*, 728 S.W.2d at 365; *Denbow*, at 236.

 Appellant argues that the evidence in the instant case was insufficient to support his conviction because it only established his "mere presence" at the scene and did not affirmatively link him to the contraband. We disagree. We will set forth the evidence presented at trial. Since, the statement of facts spans more than 14,000 pages, the evidence has been divided into four categories: (1) The Rains County Search; (2) The Hood County Search, (3) Other Evidence; and (4) Testimony of Expert Witnesses.

### (1) THE RAINS COUNTY SEARCH

At about 3:00 a.m. on June 17, 1987, an individual approached Rex Wilemon ("Wilemon"), a Trooper with the Department of Public Safety ("D.P.S.") Highway Patrol in Sulphur Springs, Texas, and gave him some information. Wilemon who was on duty and in uniform at that time, took the individual to D.P.S. headquarters where Wilemon obtained additional information. Wilemon then contacted Dan Easterwood ("Easterwood"), a narcotics investigator with the D.P.S. The individual left D.P.S. headquarters, and thereafter, at approximately 5:00 a.m., Easterwood and D.P.S. narcotics Sergeant Frank Montana arrived there.

Using the instructions given by the individual, Wilemon, Easterwood and Montana drove an unmarked car past the location described by the individual. As they approached the location, their windows were rolled up and the air conditioning was on. Nevertheless, both Wilemon and Easterwood smelled a strong sour-ether odor that they identified with methamphetamine

---

nation of the reasonable hypothesis test holding that the new definition was to be applied only to *Geesa* and those cases tried thereafter, and that the analytical construct was to continue to be applied in appellate review of cases decided prior to *Geesa*. *Id.*, at 165.

**2.** Now see TEXAS HEALTH AND SAFETY CODE § 481.-112 (Vernon 1992).

**3.** Methamphetamine is a controlled substance listed under Penalty Group 1 of the Controlled Substances Act. *See* TEX.REV.CIV.STAT.ANN. art. 4476–15, § 4.02(b)(6).

labs. According to Wilemon, at the time he first smelled this odor, they were approximately one-quarter to one-half mile from the suspect location, a trailer house located at Route 1, Box 102, Brashear, Texas (the "trailer"). As they drove past the trailer, the odor was very strong. Similarly, Easterwood testified that they were approximately 400 yards from the trailer at the time he began to smell the familiar, chemical odor or "stink" of a methamphetamine lab. Both testified that even though it was only about 5:30 a.m., all of the trailer's interior lights appeared to be on. Wilemon also noticed a black and red dual-wheeled pickup parked at the trailer as well as some other vehicles that he could not readily identify because of the darkness. The mailbox in front of the trailer bore the name "D. Gattis".

After driving past the trailer, they returned to headquarters, obtained a search warrant and recruited additional peace officers to assist in executing the warrant. Because the D.P.S. erroneously believed the trailer to be located in Hopkins County not Rains County, the Hopkins County Sheriff's Office was notified. Rick Easterwood, Dan Easterwood's older brother, who was also a D.P.S. narcotics investigator, drove to the trailer at approximately 7:30 a.m. and thereafter established surveillance on the trailer. According to Rick Easterwood, no one arrived at or departed from the trailer between 7:30 a.m. and the time of the search. At approximately 10:45 a.m., the cavalcade of law enforcement officers (the "search team") rendezvoused a short distance from the trailer, and at about 11:00 a.m., they surrounded the trailer.

Wilemon parked in front of the trailer, exited his vehicle and took cover behind a tree while Easterwood leapt onto the front porch and shouted "Police". As he did so, Easterwood and Wilemon heard the sound of running footsteps inside the trailer. Wilemon observed at least two people running past the front windows from right to left.

After shouting "Police" two or three times, Easterwood forcibly entered the front door using a pick ax, and Hopkins County Sheriff Mark Bassham, Wilemon, Officers Rupe and Shedd entered after him. Upon entry, Easterwood, Wilemon and Bassham observed Christy Lynn Lewis ("Lewis") and Tametha Tarrant ("Tarrant"), sitting or standing near the couch in the living room and Tommy Charles Haynes ("Haynes") standing in the middle of the living room floor. All three had their hands in the air and Tarrant and Lewis were screaming. Wilemon testified that all three looked tired and unkempt, and the two women appeared glassy-eyed. Additionally, Easterwood testified that at the time of Haynes' arrest, he smelled like methamphetamine. Lewis, Haynes and Tarrant were promptly handcuffed, and taken outside. Wilemon thoroughly inspected the ground beneath a sycamore tree then placed the three beneath it.

At the same time Haynes, Lewis and Tarrant were being arrested inside the trailer, Donald LaRoy Wolfe and Appellant Billy Stokes were apprehended behind the trailer while attempting to flee the scene. They were handcuffed and placed with Lewis, Haynes and Tarrant beneath the tree. After securing the area, Easterwood and other designated officers began a search of the trailer and surrounding grounds. The inside of the trailer smelled strongly of an ether-type odor. Wilemon described the strength of the odor as "overpowering" and "sickening."

The kitchen area lay to the right of the front door while the living room was situated to its left. The two areas were separated by a waist-high breakfast bar and a small broom closet. Wilemon stated that from the couch, one could see into the kitchen. In the kitchen, scales, rubber gloves, zip-lock freezer bags and a plate containing a white powdery substance were found on the table along with a bottle of syrup, a can of Dr. Pepper and a note pad with some numbers listed on it. According to Wilemon, the running sounds he initially heard came from the area of the kitchen table. Moreover, Harlon Patterson, a D.P.S. State Trooper, who had apprehended Stokes and Wolfe as they fled from the trailer's back door, testified that from the

kitchen table, the patrol car could be plainly seen as it was located "straight outside the window in plain view." On the kitchen floor, officers found several large buckets, one of which contained a damp, white powder which smelled very strongly of an ether-type odor (State's exhibits 22 & 25). D.P.S. chemist Kay Davis later determined that the damp powder was "freshly powdered-out" methamphetamine with a purity of 70 percent and a weight of 13.96 pounds or 6,343.42 grams. Davis testified that she noticed a strong ether odor when she arrived at the scene but did not smell the phenylacetic acid odor she usually associated with clandestine labs. Davis also smelled a strong chemical odor she described as "kind of an undefined odor, that's just associated with having a large amount of chemicals present." In addition to the kitchen and living room, there were two bedrooms and a bathroom in the trailer. Officers testified that in the rear bedroom ("bedroom two"), they found an array of lab equipment including glass tubing, rubber hoses and tubing, pyrex glass globes, and large jugs all within plain view. Additionally, the windows in bedroom two had been blacked out with trash bags or paper, and there were tubes running outside of the bedroom through holes in the wall or floor. The defense's expert witness, chemist John Castle, testified that from the photographs of bedroom two, the stains present led him to believe that it had been used as a speed lab and not just a storage area.

Behind the trailer, officers found a barn with a padlocked room accessible from the rear, interior wall of the barn's storage area. After cutting the lock, officers entered the room. It was approximately eight to ten feet in width and 30 feet in length. Inside, they found a variety of laboratory equipment including glass tubes, 30 to 50 gallon barrels, some of which were filled with a bright brownish-red liquid, flasks, condensers, heating mantles, large containers of ether, coffee filters containing powder, funnels, several pairs of rubber gloves in large and small sizes, at least one gas mask, many of the chemicals used to manufacture methamphetamine by the ephedrine-red phosphorous method and large fans that were running at the time officers entered the lab. According to the testimony of Davis and other members of the search team, the chemical-ether odor smelled the strongest in this room ("the barn lab"). Easterwood described the odor as a "chemical stew"; although the intensity of the ether odor varied in different areas, the basic odor was distinct. Additionally, the barn lab contained much more lab equipment than did bedroom two of the trailer.

While officers continued to search the premises, Wilemon returned to the front of the trailer. He observed that Haynes' hands were now cuffed in front rather than in the original position behind his back, and that Haynes kept placing his hands between his legs and running them underneath his body. Later, when officers lifted Haynes to his feet, Sergeant Montana found a piece of folded paper where Haynes had been sitting. This paper was a receipt from Industrial Chemical and Supply Co., Inc. for the purchase of $1,100 worth of ether. Wilemon unequivocally testified that the invoice had not been on the ground when he placed the defendants beneath the tree.

Trooper Harlan Patterson testified that Haynes told him he had been working on his carburetor shortly before police arrived. Patterson stated that there was a box containing old carburetor parts on the front porch of the trailer. However, Wilemon testified that at the time of Haynes' arrest, the hoods were down on all of the vehicles, and Haynes' hands were clean and free of oil.

In addition to the dual-wheeled pickup, there were several other vehicles including a Chevrolet pickup with a camper, a blue and white Ford pickup that the officer had trouble starting, and an old, abandoned Pontiac. Officers also found a horse trailer and a gooseneck trailer parked beside the barn. Inside the gooseneck trailer, Officers uncovered a very large, glass dome, a deep freeze filled with glassware, tubes and small globes associated with labs, a heating mantle and tarpaulins. Additional-

ly, the gooseneck contained jugs filled with liquid that emitted chemical odors.

Also at the scene, a large, heavy, silver canister was found. Because its contents were unknown and potentially dangerous, officers left the canister in some nearby tall weeds. The canister was later determined to contain ephedrine.

In addition to drug manufacturing paraphernalia, officers found:

(1) several sets of scales—both triple beam and digital,

(2) $5,000 cash inside a hanging bag in the closet of bedroom one,

(3) $3,087 in Haynes' back pocket, and

(4) $4,600 in the back pocket of some jeans found in bedroom one.

In the living room, officers seized many items including:

(1) State's exhibit 118, a nylon, travel bag that contained toiletry and personal items, including a flashlight that bore the initials "B.S." and a paper with the following writing on it: "Ron's Chemical Company", a telephone number, the name of who to ask for and a notation that read "55 gallons of ether is $2,000 . . . no L-ephedrine . . . looking Houston for L-ephedrine.";

(2) State's exhibit 170, a handgun and shells were found on the living room couch;

(3) State's exhibit 137, a briefcase that contained a Crown Royal bag full of keys, a vinyl checkbook containing checks inscribed with the name "Haynes Truck and Trailer Sales", a small pocket calculator, an address book, telephone book, an envelope addressed to Bill Stokes from a Fort Worth attorney, some other documents addressed to Stokes, ziplock plastic bags, an empty box of gelatin capsules, and a box containing gold jewelry;

(a) Additionally within State's exhibit 137, officers found a "dope grinder" with white powder in the bottom. In the file portion of the brief case, officers found a ziplock bag containing a white powder, a Bayer aspirin bottle containing a crystalline substance, and a lifetime membership to a movie club issued to Billy Stokes and signed by Haynes.

(4) State's exhibit 125, a small, soft-sided bag bearing the monogram "T.C.H." that contained a photograph of Haynes, a business card for a company specializing in laboratory glassware, and various papers and documents bearing his mother's name, Lucy West;

(5) State's exhibit 130, a spiral notebook that contained a handwritten list of laboratory equipment and corresponding catalog numbers;

(6) catalogs from laboratory equipment supply companies, and

(7) poetry and photographs of Wolfe and Tarrant that reflected their intimate relationship.

The contents of the ziplock bag and the powder from the dope grinder, collectively referred to as State's exhibit 138, were later determined by Davis to be methamphetamine of 30 percent purity weighing 13.49 grams and methamphetamine of 35 percent purity weighing 11.17 grams. Davis also determined that the Bayer aspirin bottle contained ephedrine and that the gelatin capsule contained methamphetamine in an unquantified amount.[4]

Easterwood's search of the black and red pickup produced State's exhibit 131, a sales receipt from Industrial Chemical Supply Co., Inc., which was the same type of receipt found on the ground beneath Haynes following his arrest. In the red and black pickup, Easterwood also found blue jeans with laundry tags on them bearing the names "Haynes and Christy Lewis", correspondence between Haynes and Lewis that indicated they were romantically involved, and a grey satchel that contained delicate, feminine items and jewelry. In the camper, officers found State's exhibit 122, a

---

**4.** Items associated with Tarrant and Wolfe were also found at the scene but Tarrant has not appealed her conviction and Wolfe is deceased. Thus, where possible, we will confine our discussion to the evidence pertaining to Appellants Lewis, Haynes and Stokes.

black bag that contained an envelope with receipts issued to Christy Lewis.

Some of the beakers contained in bedroom two, were marked with "TNS", which according to Easterwood, was the logo for Triple Neck Scientific, a chemical supply company in California. Triple Neck's telephone number appeared in one or more of the address books seized at the scene and was also found among the papers in the camper associated with Christy Lewis. Given the size and weight of the beakers, flasks and containers of chemicals, Easterwood testified it would have been unlikely that only one person was manufacturing the methamphetamine.[5] Easterwood further testified that because of the location of the breakfast bar and closet, a person of Lewis or Tarrant's size might not have been able to see the kitchen table if they had been sitting on the right end of the couch. Easterwood stated, however, that aside from the strong methamphetamine smell, it should have been readily apparent that a controlled substance was present because of the other paraphernalia such as scales, gloves, baggies, buckets of powdery substances, chemical catalogs etc. present in the kitchen and living room.

When questioned by one of the defense attorneys about the defendants' reactions when the officers raided the trailer, Wilemon testified as follows:

Q. In all fairness to these four people and the charges they are charged with, and the punishment they are faced with, can you give any other kind of explanation other than the one you gave for their possible reactions?

A. Yeah. They just got caught red-handed in a drug lab.

Q. That's in all fairness to these people that's the only one you can think of?

A. Yeah, that's the only one I can think of.

The defense introduced the following evidence with regard to the Rains County search: Naomi Higginbotham, a U.S. Postal Service employee who delivered mail in Brashear, testified that she had been delivering mail to the trailer in question for eleven years and usually made that delivery between 1:30 and 4:30 p.m. According to Higginbotham, it takes her about 30 seconds to make each such delivery, but that the resident of that trailer did not often receive mail. Higginbotham further testified that she had never seen any of the defendants at the trailer before nor smelled anything out of the ordinary. Although Higginbotham remembered seeing police officers at the trailer as they were placing a piece of plywood across the front door in June of 1987, she did not remember smelling anything unusual at that time either. On cross-examination, Higginbotham stated that she did recall seeing a dual-wheel pickup at the trailer on one occasion but does not recall its color.

Mark Bassham, the Hopkins County Sheriff, testified that he participated in the Rains County Search and was the third person to enter the trailer after Easterwood axed the door open. Bassham stated that he heard no sounds prior to their entry. Bassham further testified that he first noticed an ether-chemical odor when he was about one-quarter mile from the trailer, but that the odor was most intense inside the barn's lab. Bassham too testified that there was a box of carburetor parts on the front porch at the time they entered the trailer.

John Castle, the defense's expert chemist, testified that it would have been nearly impossible to have smelled a chemical-ether odor from a quarter to half a mile away from the barn because the ephedrine method does not have the characteristic stench produced by the phenylacetone method of production, and ether evaporates so quickly that its odor does not travel far before dissipation. He further stated that the odor would probably not have been detectable inside the trailer.

---

5. Easterwood testified that the beaker contained in the gooseneck trailer was the largest that he, in his many years of experience, had ever seen.

## (2) THE HOOD COUNTY SEARCH

On June 18, 1987, the day after the arrest of Haynes, Lewis, Stokes, Tarrant and Wolfe, officers executed a search warrant on Haynes' residence located at 1192 Capricorn in Granbury, Texas. D.P.S. investigator Johnny Prince described the residence as a double-wide trailer house. Easterwood testified that upon entering the residence, they searched its interior as well as its garage and a small office located behind the garage's back wall.

In the office, officers found three, large, metal canisters like the one placed in the weeds outside the trailer in Rains County. Additionally, they found a dial-a-gram scale, a box containing a bag of white powder and a Hobart electronic, digital scale with a nine-pound capacity and a programmable, pricing function capable of calculating price according to weight[6]. They also found a styrofoam chest containing a trash bag with white powder in it. Inside the desk, Prince found a box of business cards for "Haynes Truck and Trailer Sales."

In the den, officers found a VHF pocket scanner capable of monitoring police frequencies,[7] and another dial-a-gram scale. In bedroom one, which appeared to be used as a junk-filled storeroom, officers found a money counter, a cardboard box containing a trash bag of white powder and a large scoop, a blue canister containing several baggies, one of which had powder inside, and a brown container. Prince detected the odor of amphetamine or methamphetamine inside the blue canister. Additionally, in one of the bedrooms, officers found some powdery substances and a driver's license issued to Billy Wayne Stokes.

Rick Easterwood seized the following items from one of the bedrooms at the residence:

(1) a cosmetology certificate issued to Christy Lynne Lewis;

(2) a bill from Loews Anatole Hotel addressed to Mr. and Mrs. T. Haynes;

(3) a Tarrant County tax statement issued to Haynes;

(4) a heat-sealed identification card issued to Lewis;

(5) a copy of the articles of incorporation for TDH Enterprises, Inc. showing Haynes as its president, listing his Capricorn residence as his address and showing his mother, Lucille West as its secretary/treasurer;

(6) a photo of Haynes and Lewis, and a photo of Haynes and his cousin, Corky Snow.

Rick Easterwood also testified that he found both men's and women's clothing at the residence.

Officers found a Nomad trailer ("Nomad") parked behind the residence. It contained a large quantity of packing material similar to that found at the Rains County trailer. They also noticed that the Nomad's interior walls were covered with brown stains similar to those found in the gooseneck trailer. The odor of methamphetamine was readily apparent, and white powder was scattered in one corner of the Nomad's floor. Also parked behind the residence were a maroon Lincoln Continental, a corvette, a brown Cadillac and a pickup; in the garage, officers found five Harley–Davidson motorcycles.

### (3) OTHER EVIDENCE

*State's Witnesses:*

The State called Kay Orr, an employee at the Movie Set video rental store in Sulphur Springs, Texas. Through Orr, the State introduced State's exhibit 193, a VCR rental agreement dated April 18, 1987, executed by Tommy Haynes. The agreement listed Haynes' home address as 1192 Capricorn, Granbury, Texas, and his business address as Route 1, Box 102, Sherley.[8] Haynes listed the trailer's phone number as

---

6. The Hobart scale was much larger than any of those found at the Rains County scene.

7. When Prince turned on the scanner, he recognized the voices of some fellow officers being transmitted over the scanner.

8. The names Sherley, Brashear, and Bonanza Community are used interchangeably by witnesses for the trailer's location in Rains County.

his business phone,[9] and the driver's license number on the rental agreement corresponded with the number on State exhibit 141, Haynes' driver's license.

Sherry Lynn Dickey testified that she lived on Route 1, less than one-half mile from the trailer. Her grandmother leased the trailer in March of 1987 to David Gattis, a/k/a Donald "Doc" Wolfe. Thereafter, Dickey noticed that the traffic along that rural route had doubled or tripled in the afternoons. Between March and June of 1987, Dickey saw the black and red pickup on 15 to 20 occasions but never saw it parked at the trailer when she passed by. She remembers it because it had lots of lights on it and looked like a millionaire's truck; she and her husband jokingly referred to it as the Christmas tree because of its lights. Dickey further testified that about five nights before the arrest, the wind was blowing toward her home from the direction of the trailer and she noticed a peculiar odor that she had never smelled before. Following the arrest, she walked up to the room behind the barn and smelled the same odor. Even two or three days after the arrest, she could smell a faint ether odor outside the barn. She stated that she mentioned the odor to Paul Ray Adams, a neighbor.

Jerry Henderson, the security coordinator and custodian of records for Con Tel of Texas testified that telephone service for the trailer house in Brashear was established on February 26, 1987 and terminated on July 24, 1987. Between the beginning of that service period and June 14, 1987, Haynes' Granbury residence was telephoned on 21 occasions. Additionally, his records reflect that Haynes' mother's home in Fort Worth was telephoned on June 16, 1987 at 11:00 a.m.

Carol Powers, the custodian of records for Southwestern Bell Telephone Co., testified that according to Bell's records, 15 telephone calls were made from the Capricorn residence to the trailer in Brashear between March and June of 1987. Additionally, a call was made on March 24, 1987

to telephone number (619) 561–4776 in El Cajon California; this phone number matches the phone number for Triple Neck Scientific that was listed in State's exhibit 140. Furthermore, Bell's records reflected that on June 15, 1987, a phone call was made to the Brashear trailer from a pay phone in Sulphur Springs, and it was charged to the Granbury residence account.

*Defense Witnesses:*

The defendants called Paul Ray Adams, a county road and bridge department employee, who testified that he resided about one and a quarter miles from Sherry Dickey. He further stated that he had personal knowledge of the June 17 arrests because early that afternoon he had brought a dolly to the barn lab at Sheriff Bassham's request. Adams stated that although he had never smelled any peculiar odor before June 17, when he brought the dolly, he "walked in the tater house [barn] back there in the back and they were unloading a bunch of that stuff and everything and it stunk like the devil." Adams stated that the smell was also in the trailer, but it was not as strong as it had been in the tater house. Additionally, Adams stated that one night prior to the arrest, his son had mentioned smelling a strange odor around their house that he could not identify. Adams also testified that he had noticed an increase in traffic from time to time during that part of 1987 and had seen the red and black dual-wheeled pickup. According to Adams, after the raid on the trailer, the traffic stopped.

Lucille West, Haynes' mother, testified that Wolfe, worked for Haynes Truck and Trailer Sales selling vehicles, collecting payments and repossessing vehicles when payments were missed. She further stated that Wolfe lived with her son at 1192 Capricorn and occupied the first bedroom off the right of the hallway, and that Wolfe kept his bedroom door locked. According to West, Stokes began working for her son as a mechanic in January of 1987. With regard to the Nomad trailer, West stated that she had seen it at Haynes' residence and

9. As proof of the trailer's telephone number, the State introduced State's exhibit 113-X, a Contel telephone bill found on the breakfast bar of the trailer at Route 1, Box 102, Brashear, Texas.

even walked around it once but had never smelled anything unusual. With regard to the ether, she stated that it was used as a solvent at her son's business in Keller to remove carpet, panels and headliners, and was also used to start diesel engines.

West further testified that on the morning of June 16, 1987, her son arrived at her home at approximately 10:30 a.m. At about 11 o'clock, the phone rang, she answered it and recognized Wolfe's voice. Haynes, thereafter, had a lengthy phone conference with Wolfe then made another telephone call. After visiting with West, going over some business files and examining several titles, Haynes left West's house between 3:30 and 4:30 p.m.

On cross-examination, West stated that when she phoned her son's residence, Tarrant or Stokes would occasionally answer the phone. She also identified photographs of the blue-and white pickup and the camper as vehicles belonging to her son. With regard to Stokes, she stated that he was an authorized signatory on one of her son's checking accounts, so that he could buy auto parts without having to get Haynes' or her signature.

The defense also called John Clark, a tile contractor and rodeo acquaintance of Haynes', to testify. Clark stated that over a period of three or four weeks in 1986, he laid tile in several areas of Haynes' residence. According to Clark, Wolfe occupied the middle bedroom at Haynes' residence and even had a separate lock on its door. Every time Clark went over to the residence to lay tile, Wolfe was there. In June of 1987, Clark returned to the residence on several occasions to inspect the extent of damage caused by a water leak. During this time, he met Stokes, Lewis and Tarrant, but he did not see Wolfe there on those occasions because the water damage had caused the floor to fall in, and Wolfe had been forced to move.

On occasion, Clark would have to go to Haynes' business in Keller, Texas, and he would see Stokes and Tarrant there also. According to Clark, Stokes worked as a mechanic for Haynes. Clark also testified that Haynes and Lewis were definitely boy-friend and girlfriend, that Christy lived at the residence with Haynes and travelled with him. Stokes was also living there. Clark identified photographs of the camper and dual-wheeled pickup. He said he had seen them at both Haynes' residence and the Keller business and that he believed they belonged to Haynes.

Sodie Fleming, an investigator with the Oklahoma Department of Agriculture, testified that he had known Haynes for twenty-five years through the rodeo circuit, and that in the spring of 1986, he had seen Haynes, Lewis and Wolfe together at the rodeo in Ada, Oklahoma. According to Fleming, Stokes, a resident of Ada at that time, was also present. In 1987, Stokes went to work for Haynes as a mechanic. However, he knew that Stokes was in Oklahoma on June 12, 1987, because he had picked Stokes up at the jail after Stokes had served a 30 day sentence for a DUI conviction.

Herschel Lloyd "Corky" Snow, a real estate broker, was called by the defense to testify regarding some photographs of Haynes holding a large amount of cash. Snow, a cousin of Haynes, testified that the cash Haynes held was money Snow lent him in August of 1986. Snow made Haynes the loan after Snow sold a certificate of deposit. The photographs of Haynes and Snow were taken at Snow's residence on the day Haynes obtained the loan. A receipt for the sale of the certificate of deposit was admitted into evidence in support of Snow's testimony.

Ron Leonard, a jockey for horse trainer J.V. White who lived near the trailer, testified that he trained horse regularly on the track across the street from the trailer in Brashear. Leonard stated that he was exercising horses on the track between 8:30 and 10:00 a.m. on June 17, 1987, when police raided the trailer. Leonard further stated that he smelled nothing out of the ordinary—just sweat, horses, manure, dirt and occasionally, cigarette smoke. Although he recognized the red and black pickup as having been out at J.V.'s barn a couple of times, he did not notice it at the trailer on the day of the raid.

Defense witness Kevin Marshall testified that he had become acquainted with Haynes through the rodeo circuit. Haynes allowed Marshall, who was looking for a pickup, to "try out" the red and black dual-wheeled pickup from approximately April 7 to June 9 of 1987. Marshall finally drove the pickup to Fort Worth and returned it to Haynes and Lewis after receiving repeated phone calls from Wolfe. According to Marshall, during the period of time he had the pickup, he did not drive it in Brashear or in the Bonanza Community.

*State's Rebuttal Witnesses:*

Cameron Charles Hill, the owner of Triple Neck Scientific, Co. and an informant for the Drug Enforcement Administration ("DEA") in San Diego, California, testified that he first met Haynes and Lewis in the summer of 1985. Between that time and the fall of 1986, Haynes made about 12 visits to Hill's store and he often purchased large quantities of glassware, lab equipment and chemicals.

Hill testified that Haynes drove many different vehicles, usually pickups. On some occasions he would arrive hauling a horse trailer, and Hill would help Haynes load his purchases into the trailer. On one of these occasions, Haynes told Hill that the horse trailer was pretty good cover for running down the road because nobody suspected a cowboy pulling a horse trailer would be hauling chemicals.

Hill further testified that Haynes had no idea he was an informant, and Hill made an effort to befriend Haynes. However, each time Haynes left Triple Neck Scientific, Hill would make notes on the events that had transpired. During the year-and-a-half that Haynes visited Triple Neck Scientific, he spent between $15,000 and $20,000 dollars there. Upon being shown State's exhibit 136, an address book, Hill confirmed that his business and home telephone numbers were listed in the exhibit.

Chemicals purchased by Haynes included large quantities of red phosphorous, hydriodic acid and ether, all of which are used in the manufacture of methamphetamine through the ephedrine process. Several business receipts showing the purchase of these chemicals and other lab equipment by Haynes were admitted into evidence. With one exception when a cashier's check was used, Haynes always made cash purchases.

The last time Haynes contacted Hill was in the fall of 1987. Haynes told Hill that he had been arrested and needed to purchase some glassware and chemicals on credit since he did not have any money and everything had been seized. Hill declined the sale.

Hill testified that on November 10, 1986, DEA agents conducted surveillance on Triple Neck Scientific, and when Haynes exited the business, Hill signaled to them that Haynes was the suspect they had been waiting to follow. William Lunsford of the San Diego DEA corroborated Hill's testimony by testifying at length regarding his and other agents' November 10, 1986, surveillance of Haynes and his male companion. Lunsford and other DEA agents followed Haynes and his companion from the time they left Hill's business until six hours later when they drove out of town on the interstate. Lunsford positively identified Haynes in open court and described Haynes and especially his companion as biker-types. Lunsford detailed Haynes' actions on the afternoon in question, describing the residence, the biker bar, gas station and auto parts store that they visited before leaving town. Theodore Groder, custodian of records for American Express, further confirmed Haynes' presence in the San Diego area by testifying to charges made on his card at an auto parts store on November 10, 1986.

On rebuttal, Rick Easterwood testified that one of the boxes seized in a bedroom at the residence during the Hood County Search contained receipts from Triple Neck Scientific and several other chemical and lab equipment supply companies. These receipts were introduced into evidence and their contents were read into the record.

Tammy Gregg, a neighbor who lived across the street from Haynes' residence, testified that on several occasions during 1987, she had smelled a strange chemical odor coming from the direction of Haynes' trailer. According to Gregg, the smell

seemed to be coming from the Nomad, which she had passed on many occasions when retrieving her children from a nearby play area. She further stated that sometimes when the wind was right, she could smell the odor outside of her home, and it was the same as that she had smelled when she passed the Nomad. Upon the prosecutor's request, Gregg sniffed the end of a hose seized as an exhibit from the barn lab, and she stated that the odor was the same but not nearly as strong as that coming from the Nomad.

Gregg identified Haynes, Stokes, and Lewis in open court as having been the people who were in and out of 1192 Capricorn between the fall of 1986 and the summer of 1987. She further identified Haynes' vehicle as a big red and black pickup, and stated that Stokes drove a blue and white truck. Gregg further stated that Wolfe and a man named Dennis seemed to live at the residence while Haynes, Lewis and Stokes were just in and out. From photographs taken at the Rains County crime scene, Gregg also identified the two horse trailers she had seen parked at the Capricorn residence for a while during the early part of 1987.

Kathy Minty, manager of the Movie Set in Sulphur Springs, Texas, testified that on June 16, 1987, she rented several movies to a man and what looked like a teenaged girl. The man called himself David Gattis and his membership card was signed by Tommy Charles Haynes. Because Minty thought the situation was irregular, she recorded the man's license plate and a description of his pickup. The license number and the vehicle description matched that of Haynes' red and black dual-wheeled pickup.

#### (4) Testimony of Expert Witnesses

*State's Expert Witnesses:*

The State's expert witness, Kay Davis, a chemist for the D.P.S. in Garland took samples of the exhibits at the Rains County crime scene and stated that the methamphetamine found in the kitchen weighed 13.96 pounds and had a purity of 70 percent. After testing the methamphetamine, Davis stated that it appeared to have been manufactured through the ephedrine process using red phosphorous. State's exhibit 196–8, white powder found on the kitchen table, was identified as ephedrine. Davis testified that ephedrine is sometimes used to "cut", i.e., increase the bulk of another substance, and that there was ephedrine present in the 13.96 pounds of methamphetamine found in the bucket on the kitchen floor; it appeared to have been added as a cutting agent. Davis stated that in order to have had methamphetamine as damp as that found in the kitchen, it would have had to have been powdered-out only a short time before. She stated that it would have taken approximately two hours to powder out almost 14 pounds of methamphetamine.

Davis also analyzed State's exhibits 90 and 92, a 50 gallon container and its contents found in the barn lab. It contained 33 gallons of liquid that was divided into two layers: the top layer weighed 12.59 pounds; the second layer weighed 126.49 pounds, 4.39 pounds or 1,995.84 grams of which was determined to be methamphetamine with a purity of 100 percent. Davis determined that State's exhibit 103, identified as white powder in a square container with coffee filters, contained 73.94 grams of methamphetamine with a purity of 86 percent.

Given the coffee filters and equipment in the barn, Davis believed that the powdering process had taken place in the barn. She further stated that given the large amounts of ether necessary to turn the methamphetamine oil into powder, fans or a ventilation system would probably have been used. According to Davis, methamphetamine has a distinct odor, and it would have been at least as strong as the ether odor. Davis further stated that ether has a strong odor, and that she had smelled it from as far away as two blocks from its source. In the instant case, Davis arrived at the crime scene at approximately 12:45 p.m. and first noticed the odor when she got out of her car at the crime scene.

The State also called as an expert witness, Debra McCormick Reagan, PhD, a chemist with the D.P.S. in Waco, Texas. Reagan confirmed that the 13.96 pounds of

damp, white powder seized from the trailer's kitchen was indeed methamphetamine, more specifically dextro-methamphetamine or D-methamphetamine. She further testified that if the "cooking process" of the methamphetamine had taken place in the barn, it would not have been smelled from inside the trailer. According to Reagan, the powdering process would have created a much stronger odor. In her estimation, it would have taken between eight and ten hours to manufacture approximately 14 pounds of methamphetamine.

As pertained to the Hood County search, Reagan testified that State's exhibit 165–1, the baggy of white powder found in the box with the Hobart scale that was seized from the office, contained eight pounds and three ounces of ephedrine. The contents of the three large, metal canisters was L-ephedrine as opposed to D-ephedrine. Reagan testified that when L-ephedrine is used in manufacturing methamphetamine, it produces D-methamphetamine as opposed to L-methamphetamine. Reagan's tests also revealed that the white powder seized from the blue canister was 5.45 grams of D-methamphetamine including adulterants and dilutants.

*Defense's Expert Witness:*

The defense's expert chemist, John Castle, testified that although he had never manufactured methamphetamine using the ephedrine process, in his opinion, it would take 40 to 50 hours to manufacture 10 to 14 pounds of methamphetamine given the lab conditions that existed in the barn. His analysis of a sample of State's exhibit 25, the 13.96 pounds of methamphetamine found in the trailer's kitchen, indicated that it was 74 percent pure.[10]

*State's Expert Witness on Rebuttal:*

Dale Stobaugh, a forensic document examiner for the D.P.S. crime lab in Austin, Texas, compared several writings seized from the crime scenes with known handwriting samples taken from each defendant. While Stobaugh was unable to conclusively determine the author of many of the questioned writings by using the defendants' handwriting samples, he did definitively establish that State's exhibit 130–A had been written by Haynes. This exhibit was a list of laboratory equipment and corresponding catalog numbers found in the trailer's living room.

■ Appellant argues that "because there is no evidence to establish an affirmative link between the Appellant and any of the controlled substance or contraband, there is insufficient evidence upon which a jury could find guilt" beyond a reasonable degree. We disagree. While mere presence at the crime scene is insufficient to prove that a person is a party to the crime, it is a circumstance tending to prove guilt, which when combined with other facts, may suffice to show that the accused was a participant. *Beardsley v. State,* 738 S.W.2d 681, 685 (Tex.Cr.App.1987). Every fact need not point directly and independently to the defendant's guilt; it is sufficient if the conclusion is supported by the combined impact of all the incriminating evidence. *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Cr.App.1977); *Alvarez,* 813 S.W.2d at 224.

■ Affirmative links indicative of the accused's knowledge and control over the controlled substance include: (1) the accused had convenient access to the controlled substance; (2) the controlled substance was in plain view; (3) the controlled substance was found in an enclosed area; (4) he was in close physical proximity to a large quantity of contraband; (5) a strong odor of contraband was present; (6) paraphernalia to use the contraband was in view of or found on the accused; (7) the accused had a special connection to the contraband. *Guiton v. State,* 742 S.W.2d 5, 8 (Tex.Cr.App.1987); *Carvajal v. State,* 529 S.W.2d 517, 520 (Tex.Cr.App.1975), *cert. denied,* 424 U.S. 926, 96 S.Ct. 1139, 47 L.Ed.2d 336 (1976); *Whitworth v. State,* 808 S.W.2d 566, 569 (Tex.App.—Austin 1991, pet ref'd). Additional facts that can

**10.** According to Castle, some variance in test results is not unusual; a variance of 8 percent is acceptable.

affirmatively link an accused with the premises, and prove that he or she jointly possessed and controlled the contraband are: (1) envelopes addressed to the accused at the address where the search warrant was executed; (2) photographs of the accused seized during the search; (3) the accused is closely related to other persons in joint possession of the contraband; (4) attempted flight from the crime scene; (5) presence of other contraband or paraphernalia. *Herrera v. State*, 561 S.W.2d 175, 179 (Tex.Cr.App.1978); *Hernandez v. State*, 538 S.W.2d 127, 130–31 (Tex.Cr.App. 1976); *Brown v. State*, 807 S.W.2d 615, 617 (Tex.App.—Houston [14th Dist.] 1991, no writ); *Chavez v. State*, 769 S.W.2d 284 (Tex.App.—Houston [1st Dist.] 1989, pet. refused). *Also see Castellano v. State*, 810 S.W.2d 800 (Tex.App.—Austin 1991, no writ). These lists are not exclusive.

In the instant case, we find the following affirmative links between Appellant and the contraband:

(1) Prior to officers' entry into the trailer two individuals had been heard and seen running from the area of the kitchen where the 13.96 pounds of methamphetamine was found.

(2) Appellant was apprehended while fleeing out the trailer's back door;

(3) There was the strong odor of methamphetamine at the crime scene;

(4) In the living room of the trailer, officers found a briefcase that contained correspondence, documents, a membership card and other personal items belonging to Stokes; in that same brief case officers found several items of contraband and drug paraphernalia including an empty box of gelatin capsules, and a "dope grinder," a ziplock bag and a Bayer aspirin bottle all containing methamphetamine.

(5) Officers also found a travel bag in the trailer living room that contained toiletry and personal items, including a flashlight that bore the initials "B.S." and a paper with the following writing on it: "Ron's Chemical Company", then a telephone number, the name of who to ask for and a notation that read "55 gallons of ether is $2,000 ... no L-ephedrine ... looking Houston for L-ephedrine."

(6) According to several witnesses, Stokes was not only employed by Haynes but also appeared to be living at Haynes' Granbury residence with the other co-defendants during the time the odor of methamphetamine was periodically smelled coming from the Nomad travel trailer behind the residence.

Given these facts, we believe that a rational trier of fact could find beyond a reasonable doubt the requisite elements of knowledge *and* actual care, custody, control or management over the contraband. Moreover, in light of the evidence presented, we find no alternative, reasonable hypothesis other than the guilt of Appellant, nor was one suggested by Appellant. Accordingly, Appellant's first point of error is overruled.

By his second point of error, Appellant alleges that the trial court erred in failing to grant his Motion for Severance of Trials. In his motion, Appellant alleged that because co-defendant Haynes had one or more prior felony convictions that could be used against him, Appellant would be prejudiced. Such motions are governed by TEX. CODE CRIM.PROC. art. 36.09 which provides:

SEVERANCE ON SEPARATE INDICTMENTS

Two or more defendants who are jointly or separately indicted or complained against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further that in cases in which, upon timely motion to sever, *and* evidence introduced thereon, it is made known to the court that there is a previously admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defen-

dant whose joint trial would prejudice the other defendant or defendants. (emphasis added)

Following voir dire, the Court entertained and overruled Appellant's motion without hearing evidence or argument.

 At the guilt-innocence phase, evidence of Stoke's prior conviction for DUI was introduced by a defense witness without objection; therefore, Stokes was not entitled to a severance as a matter of right. *Mulder v. State*, 707 S.W.2d 908 (Tex.Cr. App.1986). In addition to filing a timely motion for severance, a defendant must offer proof in support of the grounds for severance. *Saunders v. State*, 572 S.W.2d 944, 948 (Tex.Cr.App.1978); *Gibbons v. State*, 794 S.W.2d 887, 891 (Tex.App.—Tyler 1990, no pet.). The defendant has the heavy burden of showing clear prejudice resulting from the denial of a requested severance. *Id.* Merely alleging that prejudice will result is not evidence of or sufficient showing of prejudice under Art. 36.-09, particularly, as here, where the severance is discretionary with the court. *Mulder*, at 915. If a motion for severance is not supported by evidence, its denial is not an abuse of discretion. *Ransonette v. State*, 550 S.W.2d 36, 41 (Tex.Cr.App.1976). Since Appellant failed to introduce any evidence in support of his motion for severance, the trial court did not abuse its discretion in denying it.

Moreover, Appellant has shown no prejudice resulting from Haynes' prior convictions. During the guilt-innocence phase, no evidence of Haynes' prior convictions was introduced. Therefore, despite the complaints in Appellant's brief, he has shown no injury. *Rivello v. State*, 476 S.W.2d 299, 300 (Tex.Cr.App.1971).

Appellant complained that the excerpt from the testimony of Mr. Barberino, Haynes' former probation officer who was called to identify Haynes' handwriting, informed the jury of Haynes' prior convictions. A review of the record demonstrates that the testimony about which Appellant complains was elicited from the witness during *in camera* proceedings *outside* the presence of the jury. Similarly, Appellant's complaint regarding the admission into evidence of State's exhibit 221–K9 is without merit. This exhibit was a compilation of several handwritten probation reports that Haynes had submitted to Barberino. Contrary to Appellant's contentions, these reports were not prejudicial to Appellant since they were not exhibited to the jury, but were admitted **only for record purposes.**

Additionally, although the motion to sever was overruled by the Court, the Court gave Appellant the opportunity to renew his motion from time to time in the event additional grounds for severance became manifest during trial. Appellant's remaining complaints are that the joint trial had a chilling effect on his ability to call witnesses in his defense and to freely exercise his right to decide whether to testify. Neither these arguments nor evidence supporting them was presented to the trial court at pretrial or preserved by the renewal of his motion to sever. On the contrary, in an *in camera* proceeding, most of the defendants testified that they were asserting their fifth amendment right against self-incrimination because of the charges pending against them. For all these reasons, Appellant's second point of error is overruled.

 By his third point of error, Appellant alleges that he was deprived of a fundamentally fair trial because the trial judge was not neutral and impartial. Appellant asserts for the first time that because Judge Lanny R. Ramsay signed the warrant which led to his arrest and the seizure of contraband, he was biased against him, and the Motion to Recuse should have been granted.

The motion to recuse was filed on December 18, 1987, several days before trial. Judge Ramsay did not recuse himself. He did, however, request the Presiding Judge to assign a judge of that Administrative District to hear the recusal motion as directed by TEX.GOV'T CODE ANN. § 74.-059(c)(3) (Vernon 1988).[11] On the day the

11. The Court of Criminal Appeals has held that this statute does apply to criminal cases.

motion was filed, District Judge Paul Banner was assigned to and did hear this aspect of the case. As grounds for the recusal motion, it was alleged that Judge Ramsay, as magistrate, signed the search warrant that resulted in "certain seizures" and the arrest and indictment of the Appellant. He further asserted that, "the signing of the search warrant by the Honorable Lanny Ramsay makes said Judge a potential fact witness herein and therefore ineligible to sit as the Judge Presiding of the trial of this cause of action."

The only evidence at the hearing on the recusal motion was the stipulation that Judge Ramsay acted as magistrate in issuing the Rains County search warrant used in this case.[12] After argument of counsel, Judge Banner denied the Motion to Recuse, which order was filed on December 30, 1987.[13]

■ The refusal of Appellant's motion is reviewable only for abuse of discretion. *Kemp v. State*, 846 S.W.2d 289 (Tex.Cr. App.1992). There are numerous Texas cases that stand for the proposition that the mere fact that a judge authorized arrest and search warrants involved in a case is not a barrier to that judge presiding over the trial of that case on its merits. *Id.; Castillo v. State*, 761 S.W.2d 495, 505 (Tex. App.—Waco 1988), *aff'd on other grounds*, 810 S.W.2d 180 (Tex.Cr.App.1990); *Irwin v. State*, 441 S.W.2d 203 (Tex.Cr.App.1969), *cert. denied*, 394 U.S. 973, 89 S.Ct. 1454, 22 L.Ed.2d 752. The contention that Judge Ramsay might have been called to testify as a witness in a later non-jury hearing on

a motion to suppress was not a barrier to his trying the case; this circumstance is presented in every case wherein the trial judge has issued a warrant. *See Durrough v. State*, 620 S.W.2d 134, 143 (Tex. Cr.App.1991) (where warrants were issued by appellate judges).

We hold that Judge Banner did not abuse his discretion in denying the Motion to Recuse. Appellant's third point of error is overruled.

■ By his fourth and final point of error, Appellant alleges that the trial court erred in charging the jury in a manner which caused the jury to find the Appellant guilty of a charge not set out in the indictment thereby reducing the State's burden of proof. The indictment alleges in relevant part that Appellant "did then and there *intentionally possess* with intent to deliver a controlled substance,". (Emphasis added). The charge, however, provides that the jury could find Appellant guilty of the offense if they found that Appellant did *"knowingly or intentionally possess*, with intent to deliver a controlled substance ...*"* (Emphasis added). Appellant argues that the jury charge allowing the jury to find the Appellant guilty on the basis of a reduced mental state of "knowingly" as opposed to the alleged mental state of "intentionally" had the effect of reducing the State's burden of proof.

Appellant's argument is without merit. The statute under which Appellant was convicted follows:

---

*McClenan v. State*, 661 S.W.2d 108, 110 (Tex.Cr. App.1983).

**12.** Because Appellant's failed to produce evidence that there was a defect in the underlying affidavit or the proceedings surrounding the issuance of the subject search warrant, the trial court did not err in refusing to permit Appellant to call Judge Ramsay to testify as a witness. *See Brooks v. State*, 642 S.W.2d 791, 796 (Tex.Cr. App.1982). The question of the trial judge testifying as a witness would, therefore not be presented.

**13.** On December 23, 1987, Appellant filed "Motion to Suppress No. 3" premised upon certain objections to the subject search warrant's execution; this motion pertained to all evidence seized pursuant to the Rains County search war-

rant. At the hearing on this motion on January 5, 1988, Appellant called presiding Judge Lanny Ramsay to testify as a witness in this non-jury hearing, whereupon the State objected, citing TEX.R.CRIM.EVID. 605, which prohibits the presiding judge at a trial from testifying as a witness in that trial. Judge Ramsay did not testify. Counsel for Appellant then advised that he would have asked Judge Ramsay, had he agreed to testify, questions pertaining to the truth of paragraphs II through X of the Motion to Suppress No. 3. Thereafter, on February 11, 1988, the Court overruled Motion to Suppress No. 3. On appeal, Appellant has raised no point of error pertaining to the Court's overruling of Motion to Suppress No. 3.

Sec. 4.03 (a) Except as authorized by this Act, a person commits an offense if he *knowingly or intentionally* ... possesses with intent to manufacture or deliver a controlled substance listed in Penalty Group 1.

TEX.REV.CIV.STAT.ANN. 4476–15 (Vernon Supp.1988).

The words "intentionally" and "knowingly" are defined as follows:

Sec. 6.03

(a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

(b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX.PENAL CODE, § 6.03 (Vernon 1974).

It is well established that where an indictment alleges an offense was "knowingly and intentionally" committed, it is essential that the court's charge contain the required culpable mental state of either "knowingly" *or* "intentionally"; "[s]uch an omission of an essential element of the offense renders the charge fundamentally defective." *Stidham v. State*, 590 S.W.2d 502, 503 (Tex.Cr.App.1979). However, numerous cases have held that it is not fundamental error if the indictment alleges a crime was committed "intentionally *and* knowingly" while the charge submitted to the jury states that it was committed "intentionally *or* knowingly." *See, Archie v. State*, 615 S.W.2d 762, 766 (Tex.Cr.App.1981); *Hammett v. State*, 578 S.W.2d 699, 713 (Tex.Cr.App.1979); *Cowan v. State*, 562 S.W.2d 236, 240 (Tex.Cr.App.1978); *Mott v. State*, 543 S.W.2d 623, 627 (Tex.Cr.App.1976); *Perez v. State*, 704 S.W.2d 499, 502 (Tex.App.—Corpus Christi, 1986); *Garcia v. State*, 634 S.W.2d 888, 889 (Tex.App.—San Antonio 1982, no pet.). In *Cowan*, the court held that even though there had been a specific objection to the disjunctive expression of the culpable mental state in the court's charge, and the trial court had overruled the objection, such an expression in the disjunctive was not reversible error. *Id.*, at 240. Moreover, in *Wilmeth v. State*, 808 S.W.2d 703 (Tex.App.—Tyler 1991, no pet.), this Court held that it was not fundamental error for the trial court to have included in the application language of the court's charge, the culpable mental state of "knowingly" even though it had not been included in the indictment. *Id.*, at 707. Therefore, Appellant's fourth point is overruled.

The judgment of the trial court is in all things **affirmed.**