

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37981-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT PATRICK MAYKIS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — A jury found Robert Maykis guilty of malicious harassment and second degree assault, with special verdicts finding that he was armed with a deadly weapon for each count. Mr. Maykis appeals, claiming the trial court erred by: (1) prohibiting counsel from using the N-word during voir dire, (2) admitting evidence of the victim's brain injury, (3) excluding evidence of post-incident "run-ins" between the victim and defendant, including a subsequent apology, and (4) finding that a rock could constitute a deadly weapon for purposes of the sentencing enhancement. Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.    ALLEGATIONS

After a longer than normal bus ride home, Earl Brewster, a 65-year-old black man, needed to relieve himself. Believing that he would not make it to his bathroom, he walked between a couple of trucks parked on a lot near the bus stop and began to urinate on a fence. As he unbuckled his pants, Robert Maykis, a white male, approached him from uphill on the opposite side of the fence. Mr. Maykis yelled racial slurs at Mr. Brewster to include "porch monkey," "black Obama motherfucker," "fucking n----r," and told Mr. Brewster to "go back to where he came from" and threatened to "kick his ass."

Mr. Maykis leaned over the fence, trying to punch Mr. Brewster. When his efforts failed, Mr. Maykis picked up a rock and threw it over the fence at Mr. Brewster with great force. The rock was the "size of [the officer's] two fists," approximately 9 inches. Report of Proceedings (RP) at 415, 418. Mr. Brewster's head was within range of being struck by the rock since it fell from above him, but as he moved back, the rock struck his knee. Mr. Brewster cried out from the injury and fell over. Mr. Brewster yelled that he was calling the police, and Mr. Maykis told him to "go ahead" because he had witnesses. RP at 421. Mr. Maykis then entered his apartment, changed clothes, and left the scene in his vehicle. Mr. Maykis's girlfriend partially witnessed the incident from inside their second-story apartment through a fence and bushes. A female independent bystander fully witnessed the incident and took photos of Mr. Maykis's vehicle. Mr. Brewster

2

sustained a small permanent mark where the rock hit his knee, which caused lasting pain that is "bothersome." RP at 509.

Mr. Maykis was charged with malicious harassment and second degree assault with special allegations that both were committed with a "deadly weapon." Clerk's Papers (CP) at 13-14. The case went to trial.

B.    VOIR DIRE

During jury selection, the parties asked the jurors about discomfort with racial tension in America, racial stereotypes, "hate crimes" and touched on whether jurors held personal racial or ethnic bias. The defense then stated, "In this case, you might hear much more offensive language." RP at 294. The State objected to this line of questioning on the basis that it addressed evidence they might hear. Outside the presence of the jury, defense counsel clarified that he was going to talk about the specific language of the case to determine if jurors had a visceral response to the "N-word" that would interfere with the jury's ability to be "fair and impartial." RP at 321, 322. The trial court sustained the State's objection and reasoned that "we ask jurors about whether or not they can handle photographic photos. But we don't show them the photos and say, are you going to be okay?" RP at 297. The court proceeded to give a curative instruction that defense counsel could ask about "all the worst words that they can think of without talking about them specifically." RP at 298.

Defense counsel continued voir dire by asking whether calling somebody names is enough to be a hate crime. Juror No. 30 responded that if the case were to include cruel language showing racism towards somebody, "it would be hard for me . . . . But I would follow the evidence and the law." RP at 311-12. Juror 30 was excused by peremptory. Juror 5 was excused due to discomfort with provocative language associated with hate crimes. Juror 53 (not seated) indicated, "I have a real hard time when I hear people using certain words . . . . Racial stuff." RP at 313-14. Juror 46 (not seated) also expressed similar concerns. After trial began, and a witness testified about Mr. Maykis calling the victim the N-word, defense counsel moved for a mistrial because he was not allowed to explore the jury venire's reaction to that specific slur during voir dire. The trial court noted that the jurors did not visibly react when the witness was testifying and denied the motion for mistrial.

C.     EVIDENCE OF BRAIN INJURY, RUN-INS, AND APOLOGY

On direct examination, Mr. Brewster testified that he had a brain injury that affected his memory. The State later asked how a rock strike would affect him, to which a defense objection was sustained. The State then asked whether his skull was "fine." RP at 475. Defense counsel objected to relevance without elaboration, and the court overruled. Mr. Brewster explained:

> A few months before—well, several months before the incident, I just had a reconstructive surgery. It's just mainly plastic and things up there.
> Because I had a massive seizure some years back and I just got around to

4

reconstructing it. And the surgeon said don't fall again or don't let anything hit it. This thing is not settled. Avoid at all costs getting hurt on your head. And then this guy launches a rock. So my instinct was to just move back. I would have took it to the chest and face before I let something hit me square in the head because that's where the projectile was going, man. I got my eye on it. I moved back.

RP at 475.

The State then asked Mr. Brewster, "How sure are you it's the defendant that assaulted you sitting here today?" RP at 480. Mr. Brewster responded, "Oh, we've had a run-in or two since. Not violent or anything. Pleasant at the time." *Id.* Defense counsel did not object, and the State moved on to a different topic.

During cross-examination, defense counsel asked about the "run-ins," and the State objected based on relevancy. RP at 492. Defense counsel asserted that the question generally addressed Mr. Brewster's credibility and bias but could not provide specific examples. The State proffered that defense counsel was really trying to elicit a subsequent apology made by Mr. Maykis during one of these run-ins.

The trial court allowed defense counsel to voir dire Mr. Brewster outside the presence of the jury. Defense counsel asked about the nature of the "run-ins" and if Mr. Maykis called him names or behaved menacingly in later interactions with Mr. Brewster. Mr. Brewster testified that Mr. Maykis had apologized during one of the "run-ins" and Mr. Brewster felt this was because "he feels he is ashamed of himself . . . he says he's sorry, those kind of things." RP at 500. Mr. Brewster clarified that after the incident Mr.

5

Maykis would "wave at me every day and act like we're buds because we're not. You hurt me, man." RP at 501. These contacts made Mr. Brewster uncomfortable.

Defense counsel asserted that the information was relevant because it supported the State's case by showing consciousness of guilt. The State responded that it did not elicit that evidence, and defense counsel was merely trying to prove after the fact that his client was not a racist. The court sustained the State's objection on several bases: irrelevancy, hearsay, collateral subject matter, and that the evidence "doesn't go to a state of mind at the time [of the charged incident]." RP at 504.

### D. ROCK AS A DEADLY WEAPON

At the close of the State's evidence, defense counsel moved to strike the deadly weapon enhancement, arguing that a rock does not qualify as a "deadly weapon" as that term is defined in the statute. The court denied this motion.

The trial court provided jury instructions directing the jury as to the charge elements, special verdict, and asking them to set aside emotional bias and decide the case on the evidence. The jury found Mr. Maykis guilty on both counts and returned special verdicts on each count, finding that Mr. Maykis was armed with a deadly weapon, the rock.

Mr. Maykis appeals.

No. 37981-7-III
*State v. Maykis*

ANALYSIS

A. DID THE TRIAL COURT ERR BY PROHIBITING MR. MAYKIS FROM ELICITING REACTIONS TO THE "N-WORD" DURING VOIR DIRE?

Mr. Maykis argues that the trial court's decision, prohibiting defense counsel from exploring the jury venire's reaction to the N-word, violated his constitutional right to a fair trial. Criminal defendants have a constitutional right to a fair and impartial jury. U.S. Const. amends. VI, XIV; WA Const art.1, §§ 3, 22; *State v. Davis*, 141 Wn.2d 798, 824, 10 P.3d 977 (2000). The process of voir dire is intended to protect these rights by allowing parties to "'ask the prospective jurors questions touching their qualifications to serve as jurors in the case, subject to the supervision of the court as appropriate to the facts of the case.'" *Id*. at 825 (quoting CrR 6.4(b)).

While the process implicates constitutional rights, the trial court maintains significant discretion in determining how to conduct voir dire. *Id*. "[A]bsent an abuse of discretion and a showing that the rights of an accused have been substantially prejudiced, a trial court's ruling on the scope and content of *voir dire* will not be disturbed on appeal." *Id*. at 826.

As noted above, the process of voir dire is intended to flush out potential bias and determine qualifications to sit as a juror on a particular case. Voir dire is not an opening statement. Nor is it an opportunity to educate the venire on particular facts of the case, compel them to commit to a theory, argue the case, instruct on the law, or plant the seeds

7

of prejudice against an opponent. *See State v. Frederiksen*, 40 Wn. App. 749, 752, 700 P.2d 369 (1985). Instead, its purpose "'is to enable the parties to learn the state of mind of the prospective jurors, so that they can know whether or not any of them may be subject to a challenge for cause, and determine the advisability of interposing their peremptory challenges.'" *Id*. (quoting *State v. Laureano*, 101 Wn.2d 745, 758, 682 P.2d 889 (1984)).

Generally speaking, a trial court does not abuse its discretion by refusing to allow specific questions on a case-related topic. *U.S. v. Jones*, 722 F.2d 528, 529 (9th Cir. 1983) (trial court properly limited voir dire as to coercion defense); *Frederiksen*, 40 Wn. App. at 754 (upheld a trial court's refusal to allow voir dire questions about self-defense); *Lopez-Stayer ex rel. Stayer v. Pitts*, 122 Wn. App. 45, 93 P.3d 904 (2004) (upheld a court's refusal to allow use of the word "insurance" in voir dire of medical malpractice case).

When race is an issue, a trial court may abuse its discretion if it does not allow a sufficient opportunity to expose the bias of potential jurors. *State v. Brady*, 116 Wn. App. 143, 148, 64 P.3d 1258 (2003) (trial court erred by unreasonably limiting voir dire, precluding the parties from exploring bias). Where the defendant and the victim are members of a different racial group, there exists a reasonable possibility that racial prejudice might influence the jury. *Rosales-Lopez v. United States*, 451 U.S. 182, 191-92, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981). If requested by the defendant, the trial court should allow inquiry into the jury venire's bias and prejudice. *Id*. at 192.

8

No. 37981-7-III
*State v. Maykis*

In this case, the trial court allowed extensive voir dire on the issue of race, bias, and prejudice. When defense counsel attempted to use the N-word during voir dire, the court sustained the State's objection, finding that it was not appropriate to introduce specific facts about the case during voir dire. The court did allow counsel to ask the venire generally about "the worst words they can think of." RP at 298. And as a result of this conversation, several potential jurors expressed reservations about the ability to be fair and impartial.

Mr. Maykis argues that the racial overtones of the case, and the particular charges of malicious harassment, required specific voir dire questions using the N-word to avoid the possibility of prejudice, citing *Frederiksen*. But *Frederiksen* does not support Mr. Maykis's position. Instead, the *Frederiksen* court held that "The refusal to permit specific questions is not reversible error absent an abuse of discretion, which will be found only if the questioning is not reasonably sufficient to test the jury for bias or partiality." 40 Wn. App. at 752.

In this case, the responses by several potential jurors make it clear that counsel could explore, and did explore, the venire's ability to remain unbiased in the face of a highly offensive racial slur. We find no abuse of discretion.

B. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE VICTIM TO TESTIFY ABOUT PRIOR BRAIN SURGERY.

Evidentiary challenges are reviewed for abuse of discretion. *State v. Orn*, 197 Wn.2d 343, 350-51, 482 P.3d 913 (2021). An abuse of discretion is present only if there is a clear showing that the exercise of discretion was manifestly unreasonable, based on untenable grounds, or based on untenable reasons. *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).

Mr. Maykis argues that the victim's testimony about his brain surgery was irrelevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Relevancy means a logical nexus between evidence and the fact to be established. *Keisel v. Bredick*, 192 Wash. 665, 669, 74 P.2d 473 (1937).

Information regarding the victim's brain surgery first came up to explain the victim's memory difficulties, which was relevant to the accuracy of his testimony overall. Defense counsel did not object. When the State asked if the surgery made him more susceptible to injury, defense counsel's objection was sustained. The State then asked more generically whether the victim's skull was "fine." Defense counsel objected without elaboration, and the trial court overruled without elaboration. The victim ultimately responded that fear of extreme injury led him to back up from the rock thrown

by the defendant, which caused the rock to hit his knee instead of his head. The testimony was relevant to the assault element of the victim's state of mind. The trial court did not err.

Even if we were to find error, it would not be prejudicial. Where an error is not of constitutional magnitude, we apply the rule that "error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected." *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). Under this harmless error analysis, we focus on the remaining evidence. In this case, Mr. Maykis threw a large rock at the victim's head in a downward trajectory. As we note below, under these circumstances, it was not error for the jury to find that the rock was "readily capable of causing death or substantial bodily harm" regardless of the victim's particular susceptibilities.

C. WHETHER THE TRIAL COURT VIOLATED MR. MAYKIS'S CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE BY EXCLUDING EVIDENCE OF SUBSEQUENT "RUN-INS" AND APOLOGY.

Mr. Maykis also argues that the court abused its discretion and violated his constitutional right to present a defense by prohibiting his attorney from cross-examining the victim about subsequent interactions with Mr. Maykis. "We review de novo whether the trial court's evidentiary rulings abridged a defendant's Sixth Amendment rights." *Orn*, 197 Wn.2d at 350.

11

Mr. Maykis contends that his attorney should have been allowed to cross-examine the victim on the nature of these interactions because the phrase "run-in" carries negative connotations and suggests that Mr. Maykis was continuing to harass the victim. We reject this argument.

As the trial court noted, the open-door doctrine has its limitations and only allows cross-examination that will "explain, clarify, or contradict the first party's evidence." *State v. Crow*, 8 Wn. App. 2d 480, 505, 438 P.3d 541 (2019). When asked, defense counsel did not indicate that he needed to explain or clarify any negative connotations about the interactions. Instead, this claim is being made for the first time on appeal.

Nor was counsel attempting to ask questions about the witness's identification of Mr. Maykis or challenge the witness's credibility. Significantly, the victim himself indicated that his subsequent interactions with Mr. Maykis were "pleasant." Hence, there is nothing to suggest a pattern of harassment by Mr. Maykis or bias by the victim.

Mr. Maykis also argues that his attempt to introduce his subsequent apology was character evidence and central to his defense of malicious harassment. Mr. Maykis contends that exclusion of this evidence violated his constitutional right to present a defense. The constitutional right to present a defense is embodied in protections provided by the Sixth Amendment. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). These rights are not absolute, however, and a defendant has no right to introduce

irrelevant evidence. *Id*. Even under a constitutional analysis, the evidence rules

determine whether evidence is relevant. *See Id*.

In this case, Mr. Maykis fails to demonstrate how his apology was relevant to his

actions several days prior. Mr. Maykis contends that his subsequent apology was

character evidence, and character evidence is relevant when intent or malice is an element

of the offense, citing *State v. Eakins*, 127 Wn.2d 490, 495, 902 P.2d 1236 (1995). While

*Eakins* supports his argument that character evidence may be relevant, Mr. Maykis fails

to cite any authority that a subsequent apology constitutes character evidence.

When relevant, character evidence is introduced by way of reputation. "When an

accused offers evidence of a pertinent trait of character, ER 405(a) governs the allowable

methods of proof. Testimony may be offered as to the reputation of the accused in the

community. ER 405(a)." *State v. Kelly*, 102 Wn.2d 188, 194, 685 P.2d 564 (1984). To

rebut evidence of a certain reputation, the opposing party can then introduce evidence of

specific instances. ER 405(b). Mr. Maykis was not attempting to introduce reputation

evidence.

In addition to being irrelevant, the evidence was also clearly hearsay. At trial,

defense counsel admitted that he was attempting to introduce Mr. Maykis's subsequent

apology through the testimony of the victim. The trial court sustained the State's hearsay

and relevance objection. The introduction of this testimony would be hearsay. ER

801(c). Admissions offered "against a party," do not constitute hearsay. ER 801(d)(2).

13

Here, Mr. Maykis's attempt to introduce his own apology through the testimony of another witness was not admissible. *See State v. Finch*, 137 Wn.2d 792, 975 P.2d 967 (1999) (defendant not allowed to call a witness to recount exculpatory out-of-court statement by the defendant).

Mr. Maykis's subsequent apology was not evidence of character and was otherwise irrelevant. Attempting to introduce the apology through another witness was inadmissible hearsay. The trial court did not abuse its discretion or violate Mr. Maykis's constitutional right by excluding this evidence.

D.  WHETHER THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE DEADLY WEAPON ENHANCEMENT.

The jury returned verdicts of guilty on both charges of malicious harassment and second degree assault at trial. The jury also found, by special verdict, that at the time of committing each of these crimes, Mr. Maykis was "armed with a deadly weapon." If found, the enhancement adds additional time to a defendant's presumptive sentence. RCW 9.94A.533(4)(b), (c). Mr. Maykis contends that the evidence was insufficient[1] to

---

[1] Mr. Maykis argues that the weapon enhancement must be struck because a rock does not fit within the plain meaning of the statutory definition of a "deadly weapon." He goes on to cite case law on the due process requirement of notice when a statute is unclear, but then argues that the meaning of the statute in this case is plain and obvious. We construe this as a challenge to the sufficiency of evidence to support the enhancement and not a due process challenge.

support the deadly weapon enhancement as to both counts because a rock does not constitute a "deadly weapon" under the statute.

Whether a person is armed with a deadly weapon is a mixed question of law and fact that the appellate court considers de novo to determine as a matter of law whether the facts are sufficient to prove the alleged weapon falls within the statutory definition. *State v. Schelin*, 147 Wn.2d 562, 565-67, 55 P.3d 632 (2002) (constructive possession of a rifle under the bed at the time of a drug arrest held insufficient to prove defendant "armed" under the deadly weapon enhancement statute). The law will be reviewed de novo; the facts will be viewed in a light most favorable to the State. *Id.* at 566, 573. Sufficient evidence exists if "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Bingham*, 105 Wn.2d 820, 823, 719 P.2d 109 (1986) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

The jury was instructed that to find a deadly weapon enhancement, it needed to agree that Mr. Maykis was armed with a deadly weapon when he committed malicious harassment and second degree assault. "Deadly weapon" was defined as "an implement or instrument that has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death." CP at 58; RCW 9.94A.825. Both the statute and the jury instruction provided a non-exclusive list of

per se deadly weapons, but a "rock" is not included in the examples. CP at 58; *See* RCW 9.94A.825.

Mr. Maykis contends that a rock is neither an implement nor an instrument as those terms are used in the statute. Instead, he contends that both terms apply to devices that are manmade or "designed to injure or kill." Br. of Appellant at 25 (emphasis omitted). Mr. Maykis's argument requires us to interpret the statute. "Our primary duty in statutory interpretation is to ascertain and carry out the legislature's intent." *State v. Pratt*, 196 Wn.2d 849, 853, 479 P.3d 680 (2021).

Since the terms "implement" and "instrument" are not otherwise defined within the chapter, we apply the ordinary meaning from a standard English dictionary. *State v. Barnes*, 189 Wn.2d 492, 496, 403 P.3d 72 (2017). An "implement" is defined as "a device used in the performance of a task." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/implement (last visited May 24, 2021). It "may apply to anything necessary to perform a task," such as "crude stone implements." *Id*. An "instrument" is a synonym for implement, but more particularly "one capable of delicate or precise work." *Id*. Given these definitions, it is clear that a rock or stone may be used as an "implement." Because we find that a rock clearly and plainly falls within the definition of an implement, we do not consider Mr. Maykis's argument that legislative history and the rule of lenity support his interpretation of the statute. *State v.*

16

*Evans*, 177 Wn.2d 186, 193, 298 P.3d 724 (2013) (only if a statute is ambiguous do we consider legislative history and policies to determine legislative intent).

We recognize that while a rock may be an implement, it does not necessarily qualify as a "deadly weapon" in every instance. Instead, when an item is not within the per se list of enhancement deadly weapons, the court must consider the circumstances in which it was used to determine if it was "capable of producing death [] at the time of the commission of the offense. *State v. Thompson*, 88 Wn.2d 546, 549-50, 564 P.2d 323 (1977).

In this case, Mr. Maykis threw a very large rock with great force directly at the victim from above and at a trajectory that would have struck the victim's head if he had not backed up. Instead, the rock struck the victim's knee causing injury and a scar. Had the rock struck the victim's head, it would have had the capacity to cause death. Not because of pre-existing medical issues, but because the skull anatomically possesses significantly increased vulnerability to blunt force trauma injury. Anyone forcibly struck in the head with a 9-inch diameter rock from above would likely be killed. Under these circumstances, a rock is a deadly weapon sufficient for enhancements.

CONCLUSION

Having considered all of Mr. Maykis's issues, we find no error and affirm his convictions.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Siddoway, A.C.J.